108 N.J. Super. 19 (1969)
259 A.2d 734
JOSEPH P. LORDI, PROSECUTOR OF ESSEX COUNTY, PLAINTIFF,
v.
UA NEW JERSEY THEATRES, INC., A NEW JERSEY CORP. AND GROVE PRESS, INC., A NEW YORK CORP., DEFENDANTS. EDWARD J. DOLAN, PROSECUTOR OF MIDDLESEX COUNTY, PLAINTIFF,
v.
GROVE PRESS, INC., A NEW YORK CORP. AND NGC THEATRE CORPORATION, A DELAWARE CORP., DEFENDANTS. LEO KAPLOWITZ, PROSECUTOR OF UNION COUNTY, PLAINTIFF,
v.
WOOD PLAZA THEATRE CORPORATION AND GROVE PRESS, INC., A NEW YORK CORP., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided December 9, 1969.
*21 Mr. Robert L. Podvey, Assistant Prosecutor, for plaintiff Essex County Prosecutor (Mr. Joseph P. Lordi, Prosecutor attorney).
Mr. David J. Monyek, Assistant Prosecutor, for plaintiff Middlesex County Prosecutor (Mr. Edward J. Dolan, Prosecutor, attorney).
Mr. Stanley Kaczorowski and Mr. Fredric Shauger, Assistant Prosecutors, for plaintiff Union County Prosecutor (Mr. Leo Kaplowitz, Prosecutor, attorney).
Mr. Richard L. Amster for all defendants. (Mr. Nathan Lewin of the New York and District of Columbia Bars, of counsel for all defendants; Mr. Douglas S. Liebhafsky of the New York Bar, of counsel for defendant UA New Jersey Theatres, Inc.; Mr. Donald S. Engel of the New York Bar of counsel for defendant NGC Theatre Corporation; Mr. Bernard Kuttner of counsel for defendant Wood Plaza Theatre Corporation).
MINTZ, J.S.C.
In these consolidated proceedings the prosecutors of Essex, Union and Middlesex Counties allege that the motion picture film entitled "I Am Curious (Yellow)" is obscene within the purview of N.J.S.A. 2A:115-1.1 et seq. They seek to enjoin the showing of this film in the theatres in their respective counties. N.J.S.A. 2A:115-3.5. The prosecutor of Bergen County did not file a formal complaint but indicated that he would abide by the judgment of the court in these proceedings. Defendants deny that the motion picture is obscene within the meaning of N.J.S.A. 2A:115-1.1 and affirmatively assert that it is within the area of constitutionally protected freedom of speech and press under the First and Fourteenth Amendments to the Constitution of the United States, and Article I, par. 6 of the Constitution of the State of New Jersey.
*22 "I Am Curious (Yellow)" was produced in Sweden. The dialogue is in Swedish with English subtitles added. This film was adjudged not obscene in a 2-1 decision in United States v. A Motion Picture Film Entitled "I Am Curious - Yellow", 404 F.2d 196 (2d Cir. 1968). The court reversed a judgment of forfeiture and confiscation entered in the federal district court upon a jury verdict of obscenity. Judge Hays, writing for the majority, recognized that there may be differences of opinion as to what the picture is "about," but said:
* * * It would perhaps not be demonstrably wrong to say that it is concerned with that subject which has become such a commonplace in contemporary fiction and drama, the search for identity. It is the story of a young girl who is trying to work out her relationship to such political, social, and economic problems as the possibility of a classless society, the acceptance of the Franco regime, and the policy and practice of nonviolence. At one point the girl experiments with oriental religious ritual and meditation. The girl's inter-personal relationships are also pictured, including particularly her relation to her father, presented as an idealist who has become disillusioned and has given up meaningful activity. A fairly large portion of the film is devoted to the relations between the girl and her young lover.
A number of different techniques are employed in the production of the film. For example much of the early part is in terms of "cinema verite," showing the girl asking questions on subjects of public importance of the ordinary man or woman in the street. The problem of the nature of reality is suggested by passages representing the girl's fantasies and by the injection into the story of material concerning the making of the picture itself, such as the director's relations with the leading actress.
There are a number of scenes which show the young girl and her lover nude. Several scenes depict sexual intercourse under varying circumstances, some of them quite unusual. There are scenes of oral-genital activity. [at 198]
The sex scenes leave very little to the imagination. One unusual scene is an episode of copulation in the crook of a very large old tree. Nearby a group of fundamentalist Christians are singing. There was testimony to the effect that this scene symbolizes the rebellion of youth against authority and tradition. There is also a scene of intercourse on the balustrade of the Royal Palace in Stockholm, in rhythm *23 to the Swedish National Anthem while a palace guard endeavors to stand at attention watching the antics of the lovers. Apparently this was intended as a humorous incident and was explained by some witnesses as symbolic of the rebellion of youth against authority. Other sexual scenes are shown with greater candor.
The sexual content is frankly presented and, as Judge Hays observed in "I Am Curious - Yellow," supra, "with greater explicitness than has been seen in any other film produced for general viewing. The question for decision is whether, going farther in this direction than any previous production, the film exceeds the limits established by the courts." [at 198]
N.J.S.A. 2A:115-1.1 provides that:
(a) The word `obscene' wherever it appears in the chapter to which this act is a supplement shall mean that which to the average person, applying contemporary community standards, when considered as a whole, has as its dominant theme or purpose an appeal to prurient interest.
(b) Any book, publication, picture, writing, record or other mechanical or electronic audio or visual reproduction or other material shall be obscene within the meaning of subsection (a) hereof if it is established that:
(1) The dominant theme of the material taken as a whole appeals to a prurient interest;
(2) The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and
(3) The material is utterly without redeeming social value.
This statute is a codification of the law finally enunciated in Mr. Justice Brennan's opinion for the United States Supreme Court in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), hereinafter referred to as Memoirs. As observed in that opinion, all three criteria set forth in the cited statute must coalesce to justify a finding of obscenity. Each of the three criteria is to be applied independently. The social value of the film can *24 neither be weighed against nor cancelled by its prurient appeal or patent offensiveness. If the material in question possesses only a modicum of social value, it is not "utterly without redeeming social value." Memoirs, at 419, 86 S.Ct. 975.
All ideas having even the slightest redeeming social importance  unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion  have the protection of the First Amendment unless excludable because they encroach upon the limited area of more important interests. The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. However, obscenity is not within the area of constitutionally protected speech or press. Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). But cf. Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).
Obscenity is excluded from the constitutional protection only because it is utterly without redeeming social value. The portrayal of sex in art, literature and scientific works is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Roth v. United States, supra, 354 U.S., at 487, 77 S.Ct. 1304. Material dealing with sex in a manner that advocates ideas, Kingsley International Pictures Corp. v. Regents of the University of the State of New York, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959), or that has literary, scientific or artistic value, or any other from of social importance, may not be termed obscene and denied constitutional protection. Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).
While the State has an interest in and may prevent the dissemination of material deemed harmful to children, that interest does not justify a total suppression of such material, for to do so would reduce the adult population to seeing and reading only what is fit for children. Butler v. Michigan, 352 *25 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957); Jacobellis v. Ohio, supra.
Judge Hays stated in "I Am Curious-Yellow," supra, that the nudity and sexual activity depicted is part of an artistic whole and is united with and related to the story and the characters which are presented. He held that although sexual conduct may be one of its principal themes:
* * * it cannot be said that "the dominant theme of the material taken as a whole appeals to a prurient interest in sex." Whatever the dominant theme may be said to be * * * it is certainly not sex. Moreover, not only is the sexual theme subordinate, but it is handled in such a way as to make it at least extremely doubtful that interest in it should be characterized as "prurient."
It is even more clear that "I Am Curious" is not utterly without redeeming social value. * * * [I]t is quite certain that "I Am Curious" does present ideas and does strive to present these ideas artistically. It falls within the ambit of intellectual effort that the first amendment was designed to protect. [404 F.2d at 199-200]
Judge Friendly, in a separate concurring opinion, stated that Judge Hays' opinion demonstrates the required modicum of social value in the film. He relied solely upon this fact in finding it not obscene and concluded:
* * * I would agree that the presence of `redeeming social value' should not save the day if the sexual episodes were simply lugged in and bore no relationship whatever to the theme; a truly pornographic film would not be rescued by inclusion of a few verses from the Psalms. While this case may come somewhat close to the line, I cannot conscientiously say that a connection between the serious purpose and the sexual episodes and displays of nudity is wholly wanting. [at 201]
Chief Judge Lumbard filed a dissenting opinion in which he stated:
Whatever one can say about the alleged significance of the film, which to this captive onlooker was a continuous and unrelieved boredom except for the sexual scenes, it is almost impossible to remember anything about it. The only impact the picture has and the only *26 impact it was designed to have are the sexual scenes; its only interest to the viewer arises from the uncertainty of the method of mutual sexual gratification in which hero and heroine will next indulge.
While the sex is hetrosexual, the participants indulge in acts of fellatio and cunnilingus. Needless to say these acts bear no conceivable relevance to any social value, except that of box-office appeal. Moreover, the sexual scenes have nothing whatever to do with the remainder of the picture. Obviously the only interest aroused for the average person is a prurient interest. Nor is it persuasive that the explicit sex scenes take only about 10 minutes out of 120. The enormous visual impact of a motion picture as distinguished from other media cannot be disregarded. Cf. Freedman v. Maryland, 380 U.S. 51, 61, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The combination of sight and sound, in the darkness of the movie theatre, result in a uniquely forceful impact on the audience. Because of the nature of this medium, sexual scenes in a motion picture may transcend the bounds of constitutional protection long before a frank description of the same scenes in a book or magazine. Cf. Landau v. Fording, 245 Cal. App.2d 820, 54 Cal. Rptr. 177 (1966), aff'd per curiam, 388 U.S. 456, 87 S.Ct. 2109, 18 L.Ed.2d 1317 (1967). * * * [at 203]
In Howard Wagonheim, Agent, etc. v. Maryland State Board of Censors Md., 258 A.2d 240 (Ct. App. Md.), filed October 22, 1969, the court by a 4-3 vote adjudged the film in question to be obscene. Three members of that court in effect adopted the dissent of Chief Judge Lumbard in "I Am Curious  Yellow," supra. A fourth member concurred but emphasized that there was substantial evidence to indicate pandering within the ambit of Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966). The three judges who dissented agreed with Judge Friendly and found that the film possessed a "modicum of social value." Counsel represented that the Maryland decision is on appeal to the United States Supreme Court.
The film in question has also been the subject of litigation in several other jurisdictions, with conflicting results. This court viewed the film and is called upon to make an independent judgment, giving such consideration as it deems appropriate to the expert testimony presented before it. Whether or not the motion picture should be suppressed requires ascertainment of the "dim and uncertain line" that often *27 separates obscenity from constitutionally protected expression. Bantam Books v. Sullivan, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).
My conclusion is that the dominant theme of this motion picture taken as a whole appeals to a prurient interest. I also find that the film is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters.
The crucial issue is whether the motion picture is utterly without redeeming social value. There was considerable testimony presented on this criterion by plaintiffs and defendants. I will first briefly record my observations respecting the witnesses for plaintiffs on this issue. Father Morton Hill, a Jesuit priest, is a member of the Presidential Commission on Obscenity and president of an organization known as Morality In Media. He stated that the film was utterly without redeeming social value. On cross-examination he testified that the important social issues in the picture are treated insignificantly. The only impact that the picture gives is the sex impact. The rest of the picture is boring. Apparently, he weighed its minimal social value against its prurient appeal and patent offensiveness, contrary to the rule prescribed in Memoirs, supra.
Dr. Ralph Brancale, a psychiatrist and Director of the State Diagnostic Center, and Dr. Basil Campean, a psychiatrist affiliated with the Center, each regarded the sex episodes as entirely unrelated to the remainder of the film. They stated that the 10 or 12 minutes of sexual encounter was included as box office appeal without which the film would not attract the public. They found no redeeming social value in the film.
James Patrick McFadden, assistant publisher of National Review, a magazine, and publisher of a newsletter entitled Combat, was of the view that the girl's social and political activities were only "vaguely related" to her personal life and that there was nothing in the movie to justify the explicit and offensive sex scenes.
*28 Charles Francis Farley Clinton, an editorial writer for Triumph Magazine was of the view that the film concerns itself with the character and habits of an unhappy promiscuous Swedish girl who may be engaged in defending Communism. He said there is also an inquiry into the mores and politics of Swedish society. However, in his opinion the patently offensive sexual theme overrides everything else in the film. He was not subjected to cross-examination, presumably because he "weighed" the social value of the film against its prurient appeal and patent offensiveness, contrary to the rule prescribed in Memoirs.
The defense presented an array of witnesses. I do not accept their testimony with respect to the first two criteria, but do find their testimony helpful with respect to the third criterion.
Ned Polsky, an assistant professor of sociology at the State University of New York, was of the opinion that the film has a great deal of social value because it deals with the discord between the generations and the search of the younger generation for new solutions. He felt that the sex scenes are not tacked on but are an integral part of the story in showing how sex is related to one's life.
Dr. David Ernest Scanlon, assistant professor of drama and speech at Rutgers, and a student of Swedish drama, testified that he regards the film as an example of the "quest" theme in which all parts of the picture fit together. He characterized it as an "earnest work of art having integrity and coherence," the product of reflection and the artist's best impulses and technique.
Hollis Alpert is a film critic for Saturday Review, a film columnist for McCall's Magazine, a publisher of four novels and a lecturer at several universities on the subject of films. He said that "I Am Curious" had social value because it deals with the problems of a young girl in quest for personal values, and that the sex scenes are definitely related to the general theme.
*29 John Ivan Simon was an articulate witness for the defense. He has taught English, the humanities and comparative literature at several universities. He is the film critic for New Leader. He has written film and theatre reviews for the New York Times, Harper's, Time Magazine and other publications. He was the drama critic for Commonweal in 1967-1968, which he characterized as a liberal Catholic weekly. He viewed the film as portraying the search for the good life and thought the film's message on sex was the need for a permanent lasting relationship. The movie gave him insight into the contemporary Swedish system. He regarded the film as a minor, though honest, work of art.
Dr. Tom Levin is an assistant professor of psychiatry at Albert Einstein College of Medicine. He said that "I Am Curious" has a significant social message in that it reveals the quest of young people for an understanding of their relationship within a particular society. The film, in his view, says that sex is an integrated part of the reality of life.
Dr. Charles Winick is a professor of sociology at City College of New York and a licensed psychologist in New York. He served as advisor on the effects of mass media to the United States Senate Subcommittee on Juvenile Delinquency. He is a member of the Executive Planning Committee of the 1970 While House Conference on Children and Youth. Dr. Winick viewed the film at the Customs House in New York at the request of the United States District Attorney in the expectation that he might be called as a witness in the federal district court proceeding to which I have already alluded. However, he testified for the distributor, Grove Press, Inc. He regarded the film as extremely important because aesthetically it succeeds in relating the various quests of Lena, the central figure in the picture. He stated that the explicit sex scenes are part of an artistic whole. He said that the film has significance in presenting themes important to today's young people and in presenting a frank characterization of Lena.
*30 Gerald J. Gargiulo is an assistant professor of religious studies at Manhattan College, and also a practicing psychoanalyst in New York. He believes the picture has social value because its real concern is to present political ideals and, secondarily, to show what young people are experiencing in sexuality. He also said that the sub-themes of nonviolence and fraternization are profoundly religious themes. Although he did not regard the film as a great work of art, he concluded that it had social value.
Professor Sol Worth is associated with the Annenberg School of Communication, a graduate school of the University of Pennsylvania. He has lectured on films at several universities and has produced films. He said that the film has artistic value and is an artistic unit. It is a complex picture that presents issues which make you think. The themes, he said, are not easy to follow, but are not disjointed, and the sexual episodes follow naturally.
Dr. Henry A. Davidson, a psychiatrist and former superintendant of Overbrook Hospital, a psychiatric hospital, testified that the film has social value in that it shows what is troubling our young adults.
The defense offered into evidence a series of reviews by film critics which were received for the limited purpose of showing that the film was seriously treated in respected publications as follows: Vincent Canby in the New York Times, John Simon, in the New York Times, Richard Schickel in Life, Leonard Gross in Look, William Wolf in Cue, Hollis Alpert in Saturday Review, Richard Atcheson in Holiday, Liz Smith in Cosmopolitan, Stanley Kauffmann in The New Republic, Leroy F. Aarons in The Washington Post, Ted Mahar in The Portland Oregonian, Bernard L. Drew in The Hartford Times and Stephen Allen in The Camden Courier-Post.
Plaintiffs offered into evidence the reviews of Alan Adelson in the Wall Street Journal, Rex Reed in the New York Times, Nancy Razen in the Newark Star Ledger, Charles Champlin in the Los Angeles Times, and James Kilpatrick in the Los Angeles Times.
*31 While I do not unqualifiedly accept everything the experts for the defense had to say on whether or not the film is utterly without redeeming social value, I believe that their collective testimony was clearly more persuasive than that of plaintiffs and amply reflects the required "modicum of social value." Memoirs, supra. And I concur in Judge Friendly's finding to which I made earlier reference and state, as he did, that I cannot conscientiously find that a connection between the serious purpose of the film and the sexual episodes and displays of nudity is wholly lacking.
However, plaintiffs urge that the alleged pandering of the movie should be decisive in finding that it is utterly without redeeming social value. They argue that the film has been advertised in a manner calculated to capitalize on its extensive portrayals of nudity and sexual activity, rather than its supposed serious message, and thus falls within the condemnation of Ginzburg v. United States, supra. The court there said that "* * * Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity." (383 U.S., at 470, 86 S.Ct., at 947, emphasis added). The pandering doctrine established in Ginzburg has been substantially incorporated in our statutory law. N.J.S.A. 2A:115-1.2 provides that
In any prosecution under the provisions of the chapter to which this act is a supplement, evidence of pandering or evidence that the sale or distribution of the material in question was exploited on the basis of its appeal to prurient interests, may be considered in determining whether the material is utterly without redeeming social value.
Plaintiffs' charge of pandering is based solely upon the sale and distribution of the scenario of the film which is contained in a paperback book sold to the general public. The scenario was designed to generate an interest in the motion picture. It is argued that this scenario contains a disproportionately high percentage of pictures of sexual activities *32 and nudity in comparison to the number of such scenes in the film. Hence, it is asserted that pandering operates to negate whatever redeeming social value the film might otherwise have and renders it obscene. In Ginzburg, supra, the court did not deal with a civil action for the suppression of a book or movie, as we are here concerned with, but rather with a criminal action based on the alleged distribution of obscene literature through the mails. While Mr. Justice Brennan's opinion for the court indicated that pandering properly could be a decisive factor in a determination of obscenity, he also emphasized that criminal convictions of defendants did not necessarily imply suppression of the materials involved, nor chill their proper distribution for a proper use. 383 U.S., at 470, 471, 475, 86 S.Ct. 942.
In the present civil actions plaintiffs seek to enjoin the showing of the film in question. Ginzburg and the instant cases are factually distinguishable. In Ginzburg there was abundant evidence to sustain the finding that the sole emphasis in the advertising was on the sexually provocative aspects of the publications. In the case at bar the newspaper advertising has been completely devoid of any such appeal. There is no claim that the advertising of the film at the theatres here involved is objectionable. The title "I Am Curious (Yellow)" is not suggestive of any appeal to prurient interests. The cover on the paperback book is equally innocuous. Additionally, the book contains not only the scenario of the film, but also excerpts from the testimony of expert witnesses in the United States District Court proceeding to which I have earlier alluded. Both have some redeeming social value and advertise the movie, at least in part, on the basis of its political and social themes. The book which now sells for $1.75 was at the time of this trial available in Newark book-stores, approximately 12 miles from the Colony Theatre in Livingston where the film is currently being shown. There was no testimony respecting the availability of the book in Middlesex or Union Counties. Under all the stated circumstances, *33 I cannot find that the advertising of the film unduly emphasizes its sexually provocative aspects.
It is plaintiffs' burden to prove that the film is utterly without redeeming social value. They have failed to do so. On the basis of all the evidence I reluctantly and with regret conclude that "I Am Curious (Yellow)" does possess a modicum of redeeming social value.
Defendants additionally urged the unconstitutionality of the obscenity statute, N.J.S.A. 2A:115-1.1 et seq., as applied to them, particularly in light of Stanley v. Georgia, supra. I refrain from passing upon the same in view of my determination that plaintiffs are not entitled to injunctive relief. It is settled law that a constitutional issue will not be resolved unless absolutely imperative in the disposition of the litigation. Smith v. Livingston, 106 N.J. Super. 444 (Ch. Div. 1969), aff'd o.b. 54 N.J. 525 (1969).
I thoroughly disliked this movie. I found it offensive and for the most part a bore. However, my subjective distaste for "I Am Curious" is not a proper basis for a finding of obscenity. I am required to act within the guidelines established by the applicable decisions of the United States Supreme Court which have been incorporated into our obscenity statute, N.J.S.A. 2A:115-1.1. In doing so this court is not acting as a censor but is instead discharging its assigned role in delineating the scope of constitutionally protected speech and press. G.P. Putnam's Sons v. Calissi, 86 N.J. Super. 82, 94 (Ch. Div. 1964), rev'd on other grounds 50 N.J. 397 (1967).
Finally, it was represented by counsel that the basic contracts between the distributor, Grove Press, Inc. and the theatre exhibitors provide for the exclusion of minors under the age of 18 from the audience. More importantly, such exclusion is dictated by N.J.S.A. 2A:115-1.3. There was no proof indicating that the current exhibitors were in violation of this provision. However, the exhibitors are cautioned to adhere strictly to this requirement.