ON PETITION FOR REVIEW OF OPINION 475 OF THE ADVISORY COMMITTEE ON PROFESSIONAL ETHICS AND DR 2–102(C).

Argued October 5, 1981—Decided April 28, 1982.

*Katharine J. Sweeney* argued the cause for appellant Jacoby & Meyers (*Sweeney, Bozonelis, Staehle & Woodward,* attorneys).

*Colette A. Coolbaugh,* Secretary, argued the cause for respondent Advisory Committee on Professional Ethics (*Colette A. Coolbaugh,* attorney; *Richard J. Engelhardt,* Staff Attorney, on the brief).

*Arthur Montano* argued the cause for intervenor New Jersey State Bar Association (*Montano, Summers, Mullen & Manuel,* attorneys; *Arthur Montano* and *Alan P. Bruce,* on the brief).

Briefs were submitted on behalf of *amicus curiae Robert B. Zagoria,* attorney, *pro se.*

The opinion of the Court was delivered by

## PASHMAN, J.

New Jersey law firms have always included only the names of New Jersey lawyers. That custom is now enforced by Disciplinary Rule 2–102(C), which forbids the use of law firm names "unless all those named are or were members of the bar in New Jersey." The purpose of the rule is obvious. It is reasonable to expect that those listed in a law firm name are licensed to practice in this State. If those persons are not so licensed, the firm name is deceptive to consumers of legal services. To the extent law firm names with unlicensed lawyers defeat consumers' reasonable expectations, the disciplinary rule protects the public against deception.

Jacoby & Meyers, a law partnership with offices in California and New York, seeks review of an opinion of the Advisory Committee on Professional Ethics which prohibited it from opening a New Jersey office under the name "Jacoby & Meyers." Neither of petitioner's named partners is or has ever been a member of the New Jersey bar. Petitioner challenges the constitutionality of DR 2–102(C) and urges this Court either to revise the rule or to grant Jacoby & Meyers an exemption from the rule's coverage.

We find that DR 2–102(C) does not invade petitioner's constitutional rights. We therefore deny the relief requested and affirm the Advisory Committee's opinion. At the same time, we have concluded that the effects of the rule and its benefits should be studied further. Our traditional method of rule evaluation is by reference to Supreme Court Committee, report and recommendation by that committee, and finally, a decision by this Court. We will follow that procedure in this case.

Moreover, to permit a full evaluation of DR 2–102(C), we have decided that our ban on television advertising in DR 2–101(D) should also be reconsidered. Jacoby & Meyers uses television advertising in New York that reaches consumers of legal services in this State. Allowing Jacoby & Meyers to affiliate with a New Jersey firm and advertise its name here while using

television in New York would give its New Jersey affiliates an unfair advantage compared to other New Jersey firms. That unfair advantage would exist even if Jacoby & Meyers did not advertise the fact of its New Jersey affiliation on television, and even if the New Jersey firm used only advertising which our rules permit.

Therefore, after the release of this opinion, the Court will refer both rules to a special Supreme Court Committee for its report and recommendations. Given the importance of the matter being considered, we will ask that Committee to subject these issues to intensive study. This will include hearings where all points of view may be expressed. We will ask the Committee to report by January 1, 1983, if possible. We express no view on the merits of this reevaluation.

The Court's responsibility in regulation of the state bar is fundamental. We have plenary and exclusive control over both admission to the bar and the practice of law. We seek to exercise that control in the interests of the public. In a rapidly changing world, we should be careful to remain responsive to the public's needs. However, it would be wrong to alter existing rules, and the legitimate expectations they create, without an understanding of what effects the changes may have. We therefore need a thorough review and study.

Finding no constitutional infirmity in DR 2–102(C), we deny the relief requested by petitioner and affirm the Advisory Committee's opinion.

I

In 1972 Leonard Jacoby and Stephen Meyers, members of the California bar, formed a profit-making law firm to serve a large middle-class clientele with basic, standardized legal services. Beginning in California, the firm expanded considerably during the 1970's using media advertising and operating out of many neighborhood law offices staffed by local attorneys. In 1979 the firm opened neighborhood offices in New York under its Califor-

nia name, Jacoby & Meyers. A third partner, licensed to practice law in New York, oversees its operations there. Jacoby & Meyers currently has 75 offices. The firm states that it interviews over 500 clients per day, accepting about 600 new matters each week.

Petitioner has indicated its desire to open a New Jersey office. On September 10, 1980, Jacoby & Meyers requested an opinion from this Court's Advisory Committee on Professional Ethics on whether DR 2–102(C) allowed the use of its name in connection with its anticipated practice here. The Committee decided in *N. J. Advisory Comm. on Professional Ethics, No. 475*, 107 *N.J.L.J.* 283 (Apr. 2, 1981) (Ethics Opinion 475), that the plain language of DR 2–102(C) forbade the use of Jacoby & Meyers as a New Jersey law firm name because neither Leonard Jacoby nor Stephen Meyers had ever been licensed to practice law in New Jersey. On April 3, 1981, Jacoby & Meyers petitioned this Court for review of the Advisory Committee opinion, pursuant to *R.* 1:19–8.[1]

## II

The initial question is whether Jacoby & Meyers has "standing" under *R.* 1:19 to petition this Court for review of the Advisory Committee decision. Petitions for Supreme Court review can be filed by "any aggrieved member of the bar, bar association or ethics committee," *R.* 1:19–8. NJSBA concedes that the words "member of the bar" do not clearly exclude lawyers from other states, but correctly notes that *R.* 1:19–8 must be read in conjunction with *R.* 1:19–2, which defines the Advisory Committee's original jurisdiction. The latter rule allows the Committee to accept inquiries "only from the state bar association, from any county or local bar association, or from any member of the New Jersey bar." *R.* 1:19–2. Strict applica-

---

[1]After granting the petition, we permitted the New Jersey State Bar Association (NJSBA) to intervene in support of the disciplinary rule.

tion of the Committee's jurisdictional limitations would compel us to dismiss the petition for review and vacate *Ethics Opinion 475.*

In view of the public importance of this matter, we choose not to take such a course. This Court has inherent power under *R.* 1:1–2 to relax any rule to prevent injustice. Granting petitioner's request for review is consistent with the intention of *R.* 1:19–8, if not its language. The Court adopted *R.* 1:19–8 contemporaneously with its decision in *Higgins v. Advisory Comm. on Professional Ethics,* 73 *N.J.* 123 (1977), which noted that no mechanism existed for appealing Committee decisions. The Court explained that "[u]nder the rule, *any proper person in interest,* on notice, may petition this Court for review of an Advisory Committee opinion." 73 *N.J.* at 127 (emphasis added). As a law firm actively seeking to open offices in this State, Jacoby & Meyers is clearly a "proper person in interest." Denying the petition for review on jurisdictional grounds would not be consistent with "fairness in administration and the elimination of unjustifiable expense and delay." *R.* 1:1–2. Petitioner raises important constitutional questions concerning a rule prohibiting out-of-state attorneys seeking to use their firm names in New Jersey. Petitioner's stake in the outcome is clear and the issues presented are sufficiently defined for our resolution.

The Advisory Committee ruled in *Opinion 475* on petitioner's inquiry despite the wording of *R.* 1:19–2 which excludes Messrs. Jacoby & Meyers from its original jurisdiction. The Committee's action was appropriate under the circumstances. Likewise, pursuant to *R.* 1:1–2 this Court will relax the jurisdictional requirements of *R.* 1:19–8 to hear petitioner's claim, because strict application of the rule would both needlessly delay the resolution of an important issue and "result in an injustice." *R.* 1:1–2.

### III

At the outset, we hold that the Advisory Committee correctly applied *DR* 2–102(C) to the petition of Jacoby &

Meyers. There is no question that the use in New Jersey of the firm name Jacoby & Meyers would violate our Code of Professional Ethics.

Disciplinary Rule 2–102(C) provides that

A lawyer or a professional corporation shall not hold himself or itself out as having a partnership with one or more lawyers or professional corporations unless they are in fact partners. A partnership shall not be formed or continued between or among lawyers licensed in different jurisdictions unless all enumerations of the members and associates of the firm on its letterhead and in other permissible listings make clear the jurisdictional limitations on those members and associates of the firm not licensed to practice in all listed jurisdictions; provided, however, *a firm name may not be used in New Jersey unless all those named are or were members of the bar in New Jersey.* [Emphasis added].

This disciplinary rule clearly prevents petitioner from using its name in New Jersey. Leonard Jacoby and Stephen Meyers have never been licensed to practice law in this State. The Code provision could not be more explicit in banning the use of their names in a New Jersey law firm. The Committee, limited as it must be to interpretation of the Code of Professional Ethics, correctly applied the existing disciplinary rule.

## IV

We now address petitioner's contentions that the provision in *DR* 2–102(C) barring use of the firm name Jacoby & Meyers unconstitutionally infringes upon the firm's First Amendment rights and violates the Commerce, Privileges and Immunities, and Equal Protection Clauses of the United States Constitution.

A. *First Amendment*

Petitioner argues that the firm name restriction in DR 2–102(C) violates the First Amendment. Jacoby & Meyers concedes that the use of a law firm name is a form of commercial speech and nothing more.[2] We are therefore asked to determine

---

[2]In *Friedman v. Rogers*, 440 *U.S.* 1, 99 *S.Ct.* 887, 59 *L.Ed.*2d 100 (1979), the United States Supreme Court found that use of a trade name in connection with optometrical practice involved speech that was entirely commercial.

[T]he optometrist who uses a trade name "does not wish to editorialize on any subject, cultural, philosophical, or political. He does not wish to

whether this rule deprives petitioner of its right to engage in commercial expression.

In the past decade, the United States Supreme Court has repudiated the notion that commercial speech does not warrant constitutional protection. The landmark case of *Virginia Pharmacy v. Va. Citizens Consumer Council*, 425 *U.S.* 748, 96 *S.Ct.* 1817, 48 *L.Ed.*2d 346 (1976), held that a state could not prohibit all advertising by pharmacists of the prices of prescription drugs. The Court stated that, just as commercial speech "is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered." 425 *U.S.* at 765, 96 *S.Ct.* at 1827. In *Bates v. State Bar of Arizona*, 433 *U.S.* 350, 97 *S.Ct.* 2691, 53 *L.Ed.*2d 810 (1976), the Court extended the reasoning of *Virginia Pharmacy* to protect the advertising of prices of routine legal services.

However, the Supreme Court has never equated commercial speech with political expression. Our society values political expression as an inherent part of the democratic process. Commercial speech, in contrast, is valued and constitutionally protected only to the extent that it conveys facts which facilitate honest commercial transactions. With that in mind, both the U. S. Supreme Court and this Court have said "there can be no constitutional objection to the suppression of commercial messages . . . more likely to deceive the public than inform it." *In re Professional Ethics Opinion 447*, 86 *N.J.* 473, 477 (1981), quoting *Central Hudson Gas v. Public Service Comm'n*, 447 *U.S.*

---

report any particularly newsworthy fact, or to make generalized observations even about commercial matters." His purpose is strictly business. The use of trade names in connection with optometrical practice, then, is a form of commercial speech and nothing more.
[440 *U.S.* at 11, 99 *S.Ct.* at 895, quoting *Virginia Pharmacy v. Va. Citizens Consumer Council*, 425 *U.S.* 748, 761, 96 *S.Ct.* 1817, 1825, 48 *L.Ed.*2d 346 (1976) (footnote and citations omitted)].
The name of a law firm is clearly a trade name as contemplated by the Supreme Court in *Friedman*.

557, 563, 100 *S.Ct.* 2343, 2350, 65 *L.Ed.*2d 341 (1980). Moreover, "a different degree of protection is necessary to insure that the flow of the truthful and legitimate commercial information is unimpaired." *Virginia Pharmacy*, 425 *U.S.* at 771, n.24, 96 *S.Ct.* at 1830, n.24.

Because commercial speech concerning the nature or price of goods and services is more objective than other speech, it burdens the speaker less to require its truthfulness. At the same time, commercial speech is perhaps more likely to be taken as objectively true, and therefore may more easily deceive the listener when false. The obvious importance of commercial speech in generating business profits insures that its proper regulation will not unduly inhibit the full flow of business information which the speaker seeks to convey. *Id.* at 775–81, 96 *S.Ct.* at 1832–35 (Stewart, J., concurring). While restraints on other forms of speech may chill expression and development of political and other ideas, regulation of commercial speech serves primarily to promote honesty and fair dealing in the marketplace.

Not all commercial speech receives identical constitutional protection. In *Friedman v. Rogers, supra,* the Supreme Court drew a distinction between different types of commercial speech which bears directly on petitioner's claim. The Court explicitly distinguished the objective and easily verifiable price information at issue in *Virginia Pharmacy* and *Bates* from the more potentially misleading information conveyed through use of a trade name. The Court noted that while *Virginia Pharmacy* and *Bates* involved speech that was self-explanatory, a trade name is

a form of commercial speech that has no intrinsic meaning. A trade name conveys no information about the price and nature of the services offered by an optometrist until it acquires meaning over a period of time by associations formed in the minds of the public between the name and some standard of price or quality. Because these ill-defined associations of trade names with price and quality information can be manipulated by the users of trade names, there is a significant possibility that trade names will be used to mislead the public. [440 *U.S.* at 12–13, 99 *S.Ct.* at 895 (footnote omitted)]

The Supreme Court noted in *Friedman* that the use of trade names has some potential communicative value, but also poses numerous "possibilities for deception." *Id.* at 13, 99 *S.Ct.* at 896. Balancing the value of trade names against their potential to mislead, the Court upheld a prohibition on the use of trade names by optometrists.[3]

It is precisely the potential for misleading the public through "ill-defined associations" inherent in trade names which Disciplinary Rule 2–102(C) seeks to address and which use of the firm name Jacoby & Meyers might engender. The potential to mislead arises from the belief that those who appear in a law firm's name are practicing New Jersey attorneys. In fact, neither named partner is licensed to practice here. Use of the name Jacoby & Meyers may therefore lead prospective clients to believe that they are dealing with a firm headed by New Jersey attorneys when in fact they are not.[4]

As we have often noted, there is nothing more important to our system of justice than public confidence in the bench and bar. Whether the attorneys in a firm are licensed to practice

---

[3]That a trade name contains no explicit falsehood did not prevent the Court from barring its use.

> "Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem." [440 *U.S.* at 9–10, 99 *S.Ct.* at 893–894, quoting *Virginia Pharmacy*, 425 *U.S.* at 771, 96 *S.Ct.* at 1830.]

[4]There is no evidence to the contrary in this record. The universal practice throughout the history of the legal profession in this State, as far as we know, has been to include *only* New Jersey attorneys in firm names. This itself is persuasive evidence of the recognized potential for such deception.

> Of course, prospective clients often inquire about a firm before retaining it. Presumably such inquiry, along with some general knowledge about Jacoby & Meyers, would lead many to the realization that the named partners are not New Jersey attorneys. Other prospective clients, however, may have less knowledge of the legal profession and may therefore anticipate that they will be getting the legal assistance of Messrs. Jacoby and Meyers themselves.

law in this state is information of the utmost importance to prospective clients. *Cf. In the Matter of R. M. J.,* —— *U.S.* ——, ——, 102 *S.Ct.* 929, 938, 71 *L.Ed.*2d 64 (1982) (listing the states in which a lawyer is licensed to practice is "factual and highly relevant."). A client who finds that the firm he has consulted is headed and controlled by lawyers not licensed—and perhaps not even qualified—to practice in New Jersey may justifiably lose confidence in the bar and in the bench that permitted such deception. The danger that such deception would occur in the absence of Disciplinary Rule 2–102(C) is sufficient constitutional justification to restrict petitioner's commercial speech.

Our holding in this case is supported by the recent United States Supreme Court decision involving commercial speech by lawyers, *In the Matter of R. M. J., supra.* While invalidating restrictions placed by Missouri on lawyers' advertising, the Supreme Court stressed that the Constitution permits prohibition of both inherently misleading advertising and advertising that experience has shown is subject to abuse. —— *U.S.* at —— – ——, 102 *S.Ct.* at 935–937. That is precisely the basis for the prohibition here. The use of a firm name in New Jersey that includes attorneys not admitted to our bar is certain to deceive at least some consumers of legal services.[5]

The inquiry does not end there, however. As the United States Supreme Court pointed out, "the remedy . . . is not necessarily a prohibition but preferably a requirement of disclaimers or explanation," —— *U.S.* at ——, 102 *S.Ct.* at 937.

---

[5]A state supreme court judge in New York recently denied a motion by Messrs. Jacoby and Meyers to dismiss an action charging them with misrepresenting themselves as attorneys licensed to practice in that state. The judge ruled that the complaint, filed by the N. Y. Criminal and Civil Courts Bar Association, stated a cause of action for violating the proscriptions on unauthorized practice in the state's Judiciary Law. *N.Y.Law J.,* April 5, 1982, at 12.

Moreover, "restrictions upon such advertising may be no broader than reasonably necessary to prevent the deception." *Id.*

This "less restrictive alternative" approach immediately suggests the possibility that the use of a disclaimer such as "Jacoby & Meyers, not licensed in New Jersey" should be permitted. However, instead of diminishing the potential for deception, we believe such an explanation would create additional confusion. It might even imply to some prospective clients an official disapproval of Jacoby & Meyers' practice. We do not believe that the Constitution's protection of commercial speech requires such risks, particularly since our interpretation of DR 2–102(C) allows New Jersey firms to affiliate with out-of-state firms and to advertise that affiliation, consistent with our rules on advertising. *See infra* at 87–90.

It might also be suggested that the deception inherent in the use of the firm name "Jacoby & Meyers" would not exist but for our rule, and that the rule change itself would end the deception. The rule has reinforced the public expectation that those named in a New Jersey firm are licensed to practice in this State. Undoubtedly a rule change would diminish that expectation over time and therefore reduce the possibility of deception. However, we see no constitutional requirement to abolish DR 2–102(C) and thereby risk such deception, since firms with named out-of-state lawyers have alternative means of advertising that are neither deceptive nor confusing; *see infra* at 87–90.

There is a further constitutional justification for the continuation of the prohibition contained in the rule. Under our rules, law firm names are "official" designations, and therefore are regulated more carefully than ordinary advertising. *See In re Opinion 447, supra.* A firm name, like an attorney's license, letterhead or business card, serves to identify a firm or association of attorneys as persons authorized to practice law in this jurisdiction. *Id.* Where, as here, the State seeks simply to ensure that the official status of an attorney as one licensed to

practice in New Jersey is conveyed with accuracy and clarity, there can be no doubt about the validity of a rule proscribing deceptive law firm names. For this reason as well, we conclude that DR 2–102(C) is a valid regulation of commercial speech.

In concluding that the First Amendment does not protect the use of the firm name "Jacoby & Meyers" in New Jersey, we note that this restriction does not hamper the ability of that firm, or any New Jersey firm with which it may be associated, to advertise the association. New Jersey firms are not prohibited from associating with out-of-state law firms or from advertising that association as long as there is no deception involved. We recognize that the legal profession has changed dramatically over the last decade, with legal advertising now permitted and the practice of law becoming increasingly interstate in scope. Our rules are flexible enough, despite the firm name restriction involved in this case, to accommodate the needs of multijurisdictional firms. Lawyers in New Jersey affiliated with such a firm will be able to signify in an appropriate manner their affiliation on letterheads, professional cards and office signs, so long as they make clear that the out-of-state firm is not licensed to practice in New Jersey. Similarly, the multijurisdictional firm will be free to advertise its association with a New Jersey affiliate, consistent with this State's rules on lawyer advertising.

This Court recognizes, however, that television advertising by New Jersey lawyers is banned, while New York attorneys have been permitted to advertise on the broadcast media. Jacoby & Meyers has legally used television ads in New York which are regularly beamed to New Jersey on interstate channels. The extent and intensity of such advertising is not in the record, and we have no way of knowing how substantial or influential it is. We do know that if petitioner were allowed to use its firm name in New Jersey in *any* form its television advertising could give it a substantial competitive advantage.

We do not pass here on the wisdom of our ban on television advertising. Advertising by lawyers is a very recent develop-

ment. Its control, abuses, advantages and disadvantages will take many years to fully appreciate. While fears may prove to be unfounded, concerns about advertising are heightened where television is the medium. This concern is underscored by the United States Supreme Court's recognition in *Bates, supra,* that "the special problems of advertising on the electronic broadcast media will warrant special consideration." 433 *U.S.* at 384, 97 *S.Ct.* at 2709, 53 *L.Ed.*2d at 836.

For the present, however, the ban exists. It has been imposed in good faith and applies to all New Jersey lawyers. Any New Jersey law firm that advertised in print its association with petitioner would be likely to gain a real benefit from petitioner's television advertising. This would produce an unfair advantage over other firms in New Jersey who comply with the rule. We would, in effect, have drawn an exception to our television ban in favor of petitioner and its New Jersey affiliates. The Court finds no conceivable justification for such an exception. Indeed we would deem it grossly unfair. We therefore hold that our ban on television advertising, DR 2–101(D), prevents New Jersey attorneys and New Jersey firms from advertising or allowing the advertising of their association with petitioner in any way, as long as petitioner continues television advertising which reaches New Jersey consumers.[6]

Our restriction on the use of out-of-state firm names which are not televised in New Jersey is highly limited, the limitation

---

[6] It makes little sense to reserve this question as the dissent would have us do. Assuming that Jacoby & Meyers is serious about coming into New Jersey, the issue will inevitably arise. Rather than leave petitioner uncertain about the terms on which it can associate with a New Jersey firm, thereby engendering further litigation, judicial economy suggests resolution of the issue here.

Further, the factual underpinning of our position—that the New Jersey affiliate will benefit from advertising by Jacoby & Meyers in New York—is far more certain than the dissent suggests. Concededly, the *extent* of the advantage is not established, but it belies reality to argue that the name recognition that would result from television advertising is of no value.

reflecting only the State's legitimate interest in preventing potential deception. The rule imposing that limited restriction, DR 2–102(C), does not violate the First Amendment. That the use of petitioner's name may be more severely restricted is not the result of the challenged rule, but rather of our ban on television advertising, which is not challenged in this appeal. If petitioner's television advertising terminates, it will stand on the same footing as any other out-of-state firm.

B. *Commerce Clause*

Petitioner argues next that DR 2–102(C) violates the Commerce Clause [7] by requiring out-of-state law firms to change their names before establishing offices within New Jersey when their named partners are not licensed to practice here. Petitioner contends that the rule's restriction on law firm names unduly burdens interstate commerce in legal services.

Under the Commerce Clause, the "crucial inquiry" is whether the law is "basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Philadelphia v. N. J.*, 437 *U.S.* 617, 98 *S.Ct.* 2531, 57 *L.Ed.*2d 475 (1978).

Measures whose only purpose is economic protection of local interests are virtually *per se* invalid. *See Philadelphia v. New Jersey, supra.* However, it is well established that a state may, in the exercise of its police power, lawfully enact legislation affecting interstate commerce, provided that the federal government has not preempted the field. Such state regulation is limited only to the extent that it discriminates against interstate commerce. *See Philadelphia v. N. J.*, 437 *U.S.* at 626–27, 98 *S.Ct.* at 2536–37. In this case, there is no such discrimination. The rule applies equally to all persons, resident and nonresident, who are not members of the New Jersey bar. In the absence of such discrimination, there can be no violation of the interstate

---

[7] *U S. Constitution*, Art. I, § 8, cl. 3.

commerce clause. *See Huron Portland Cement Co. v. Detroit,* 362 *U.S.* 440, 80 *S.Ct.* 813, 4 *L.Ed.2d* 852 (1960).

■ Even if the state regulation is directed against interstate commerce, it may be upheld if it satisfies a two-part balancing test. Applying that test, the courts will uphold regulations whenever (1) they are rationally related to legitimate state concerns, and (2) the resulting discrimination is outweighed by the state interest in enforcing the regulation. *See Pike v. Bruce Church, Inc.,* 397 *U.S.* 137, 90 *S.Ct.* 844, 25 *L.Ed.2d* 174 (1970); *Southern Pacific Co. v. Arizona,* 325 *U.S.* 761, 65 *S.Ct.* 1515, 89 *L.Ed.* 1915 (1944).

■ We need not belabor the State's legitimate interest in regulating its Bar through the enforcement of DR 2–102(C). The rule is not a "protectionist" measure, but rather a measure rationally related to the legitimate state concern of preventing deception. State legislation designed to prevent deception has long been recognized as valid, despite its incidental effects on interstate commerce. *See Pike v. Bruce Church,* 397 *U.S.* at 143, 90 *S.Ct.* at 848; *Sligh v. Kirkwood,* 237 *U.S.* 52, 61, 35 *S.Ct.* 501, 503, 59 *L.Ed.* 835 (1915). There is no constitutional obstacle to the State's prohibition of deceptive or misleading commercial speech. *Friedman, supra; Virginia Pharmacy, supra.* And "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.' " *Goldfarb v. Virginia State Bar,* 421 *U.S.* 773, 792, 95 *S.Ct.* 2004, 2016, 44 *L.Ed.2d* 572 (1975) (citations omitted).

The State's paramount interest in preventing deception in the practice of law overrides any incidental effect the rule may have on interstate commerce. While the Supreme Court recognized in *Goldfarb* that legal services are "commerce" for purposes of the Sherman Act, 15 *U.S.C.* § 1 *et seq.,* the Court was careful to emphasize that "we intend no diminution of the authority of the State to regulate its professions." 421 *U.S.* at 793, 95 *S.Ct.* at

2016. Obviously, the entire regulatory scheme for any profession affects interstate commerce in that profession's services. But "the Constitution does not require that because a lawyer has been admitted to the bar of one State, he or she must be allowed to practice in another." *Leis v. Flynt*, 439 *U.S.* 438, 443, 99 *S.Ct.* 698, 701, 58 *L.Ed.2d* 717 (1979). Even Bar rules which burden interstate legal practice substantially more than the disciplinary rule at issue here do not violate the Commerce Clause. *See Wilson v. Wilson*, 416 *F.Supp.* 984 (D.Or.1976), aff'd *mem.*, 430 *U.S.* 925, 97 *S.Ct.* 1540, 51 *L.Ed.2d* 768 (1977) (upholding a bar rule requiring Oregon bar applicants to declare their intention to be Oregon residents at the time of admission); *Aronson v. Ambrose*, 366 *F.Supp.* 37 (DVI 1972), aff'd, 479 *F.2d* 75 (3rd Cir.), *cert.* den., 414 *U.S.* 854, 94 *S.Ct.* 153, 38 *L.Ed.2d* 103 (1973) (upholding a rule requiring all Virgin Island attorneys to be domiciled there).

The Commerce Clause thus does not prevent the application of DR 2–102(C) to petitioner. The rule presents little burden on interstate commerce, and any burden is wholly incidental to valid regulation of the State bar. It allows licensed non-resident attorneys to practice law in this State *and to use their names here.* The rule treats licensed non-resident attorneys precisely the same as licensed resident attorneys. Only those non-resident attorneys *not* licensed to practice law in New Jersey face any burden under DR 2–102(C). Even these lawyers can form multijurisdictional partnerships that operate in this State, and can advertise their affiliation with licensed New Jersey attorneys. The rule's sole burden upon interstate commerce is that attorneys not licensed to practice here may not use their names in the name of a New Jersey law firm. Because the State's interest in protecting the public from deception clearly justifies this incidental restraint on interstate commerce in legal services, there is no Commerce Clause violation.

We note as a matter of information, in addition to the absence of any residency requirement in New Jersey, that we are the only state which permitted admission to the bar on the basis of

an MBE test score alone, where that test was taken in another State.[8]

C. *Privileges and Immunities Clause*

 The Privileges and Immunities Clause [9] ensures that non-residents and residents receive equal treatment with respect to "fundamental" activities whose restriction would "hinder the formation, the purpose, or the development of a single union." *Baldwin v. Montana Fish & Game Comm'n*, 436 *U.S.* 371, 98 *S.Ct.* 1852, 56 *L.Ed.2d* 354 (1978); *Salorio v. Glaser*, 82 *N.J.* 482, cert. den. 449 *U.S.* 804, 101 *S.Ct.* 49, 66 *L.Ed.2d* 7 (1980). Petitioner argues, without direct support, that the right to use its firm name in New Jersey is a "fundamental" privilege guaranteed by the Privileges and Immunities Clause.

The Supreme Court has never declared the practice of law to be a "fundamental" privilege under the clause, and nothing suggests it would now do so. To the contrary, as the Court noted in *Leis v. Flynt, supra,* several times in the last decade it has sustained state bar rules that excluded out-of-state counsel from practice altogether or on a case-by-case basis. 439 *U.S.* at 443, 99 *S.Ct.* at 701.[10]

---

[8]That practice no longer obtains, since we recently revised our rules of admission, both for residents and non-residents, to require satisfactory performance on both the MBE test and in an essay. The MBE test, however, may still be satisfied by being passed when administered out-of-state.

[9]*U. S. Constitution*, Art. IV, § 2, cl. 1.

[10]Some state courts have used the Privileges and Immunities Clause to invalidate bar requirements that effectively precluded non-residents from practicing law. *See Gordon v. Committee on Character and Fitness*, 48 *N.Y.* 2d 266, 397 *N.E.2d* 1309, 422 *N.Y.S.2d* 641 (1979) (invalidating six-month residency requirement for bar admission); *Sheley v. Alaska Bar Ass'n*, 620 *P.* 2d 640 (Alaska 1980) (invalidating 30-day requirement). In contrast to those requirements prohibiting any professional activity, however, *DR* 2–102(C) places only a limited restriction on attorneys practicing law in the State. Of crucial importance, that restriction makes absolutely no distinction based on residence and works no discrimination against licensed non-resident attorneys.

Moreover, as stated above, DR 2–102(C) only incidentally affects out-of-state attorneys. The rule treats licensed non-resident attorneys precisely the same as licensed resident attorneys. Non-resident attorneys have greater difficulty using their firm name in New Jersey only to the extent they may face greater difficulty satisfying the requirements for being admitted to the Bar or continuing to practice here. Such requirements have been upheld by the Supreme Court, *see Leis v. Flynt, supra; Wilson v. Wilson, supra,* and are not at issue here. There is no serious contention that the right to use a specific law firm name is "fundamental" for purposes of the Privileges and Immunities Clause.

The rule, therefore, does not offend the Privileges and Immunities Clause.

D. *Equal Protection Clause*

Petitioner advances a final constitutional claim that DR 2–102(C) offends Equal Protection "by unreasonably discriminating between classes of partnership names." Jacoby & Meyers argues that allowing the use of firm names containing deceased or retired partners while barring the use of firm names containing lawyers unlicensed in New Jersey irrationally discriminates against attorneys in those latter firms.

Where state regulation neither infringes upon a fundamental right nor burdens a suspect class, the Supreme Court has upheld any legislative classification based upon facts that "reasonably can be conceived to constitute a distinction, or difference in state policy," *Allied Stores v. Bowers,* 358 *U.S.* 522, 530, 79 *S.Ct.* 437, 443, 3 *L.Ed.2d* 480 (1959). In this case, petitioner points to a distinction created between lawyers in firms whose named partners are or were licensed to practice here and whose firm name therefore can be used, and lawyers such as Messrs. Jacoby and Meyers who cannot use their firm name here. Certainly, lawyers who are not licensed to practice in New Jersey do not constitute a suspect class such as race, religion or alienage deserving of extraordinary protection under the Equal Protec-

tion Clause. _See, e.g., United States v. Carolene Products Co.,_ 304 _U.S._ 144, 152 n.4, 58 _S.Ct._ 778, 783 n.4, 82 _L.Ed._ 1234 (1938). Nor is the right to use one's law firm name of fundamental importance in our ordered scheme of liberties. Petitioner must therefore argue that the distinction implicit in DR 2–102(C) between names of deceased or retired partners and names of persons never licensed to practice law here has no rational relation to the goal of protecting prospective consumers of legal services. _See Minnesota v. Clover Leaf Creamery Co.,_ 449 _U.S._ 456, 101 _S.Ct._ 715, 66 _L.Ed._2d 659 (1981).

The Court does not deny that use of a firm name containing deceased or retired partners has some potential for misleading consumers. _Cf. Nevada Sup. Ct. R. 202_ (prohibiting the use of a partner's name after three years following his death). However, the absence of an all-encompassing rule eradicating every possible species of misconception does not render the existing protections invalid. "The State [is] not bound to deal alike with all * * * classes, or to strike at all evils at the same time or in the same way." _Semler v. Oregon State Bd. of Dental Examiners,_ 294 _U.S._ 608, 610, 55 _S.Ct._ 570, 571, 79 _L.Ed._ 1086 (1935). "[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." _Williamson v. Lee Optical,_ 348 _U.S._ 483, 489, 75 _S.Ct._ 461, 465, 99 _L.Ed._ 563 (1955).

There are significant distinctions between prohibiting the use of a firm name such as Jacoby & Meyers where neither named partner has ever been licensed to practice in New Jersey and requiring that law firms change their names whenever a named partner dies. In the former case, the burden on the firm is minimal, for the reasons discussed above. By contrast, the burden entailed by a mandate that firms continually update their names would be substantial. Additionally, the death of a named partner may not substantially alter the firm's practice, and therefore should not necessitate a sacrifice in the name recognition that the firm has built. Indeed, in many cases requiring a change of name upon the death of a named partner would

cause unnecessary confusion without preventing deception where the practice of the firm remains essentially unchanged.

For these reasons, the distinction attacked by petitioner is rational and therefore constitutionally permissible under the Equal Protection Clause.

## V

Although we sustain DR 2–102(C) against petitioner's constitutional challenges, we reiterate that our opinion takes no position about the wisdom of retaining the rule. Nor do we express any opinion about the current ban on television advertising in DR 2–101(D), either in conjunction with or without the restriction on use of law firm names in DR 2–102(C). We believe that the wisdom of these rules can best be tested by allowing a full hearing on all points of view and an in-depth investigation of the underlying interests.

In regulating the advertising of legal services, this Court has used great caution. We have done so because the constitution mandates that we regulate the practice of law, *N.J.Const.* (1947), Art. VI, § 2, ¶ 3, and because we firmly believe that the practice of law differs from other enterprises. The genuine capital of lawyers does not lie in libraries of legal forms or arsenals of office equipment. It is the trust they have earned from their clients and the reputation they have developed with fellow practitioners, the courts and the community. It is the experience they have slowly accumulated by the repeated, successful exercise of judgment. This human capital is not acquired wholesale by adherence to a routinized practice. It is conveyed not by the grant of a franchise but by learning from others with experience. To the extent that an out-of-state law firm seeks to capitalize on a reputation not based on the successful practice of New Jersey law, the potential for consumer deception will always be present.

However, we recognize that in an age of lawyer advertising, reputations will no longer develop exclusively by the word of

satisfied clients. Both national firms and advertising in general provide potential benefits to New Jersey consumers of legal services. Whether the benefits of DR 2–102(C) and 2–101(D) continue to outweigh the rule's burdens is for the Supreme Court Committee and ultimately this Court to decide. In the meantime, however, we retain our disciplinary rules and uphold the constitutionality of DR 2–102(C). The petition for review is granted, and Opinion 475 of the Advisory Committee on Professional Ethics is affirmed. Petitioner's request for alternative relief is denied.

HANDLER, J., concurring in part and dissenting in part.

I concur in the essential judgment of the Court that *DR* 2–102(C) prohibits the inclusion in a firm name of lawyers not authorized to practice law in this State and is constitutional. I subscribe to this determination because the Court also recognizes the right of New Jersey attorneys to affiliate with a national law firm and to advertise their association. Hence, the firm name restriction is extremely narrow.

I do not believe, however, that the Court should deal with the question whether a national law firm such as Jacoby & Meyers or a local affiliate of that firm will be in violation of our State's ban on television and radio advertising if the local office lawfully advertises its affiliation through the conventional print media, while the national firm continues to advertise on out-of-state television without even mentioning its New Jersey affiliate. That question is premature, complex and controversial. While it is entirely appropriate to note these issues, there is no need to resolve them in this case. By ruling on an interim basis that our State's ban on attorney broadcast advertising will apply to certain kinds of television advertising involving affiliated law firms, the Court may be thought to have turned a narrow firm name controversy into a TV advertising case with substantial constitutional and public policy implications. I am not prepared in this case to resolve even provisionally the issue of whether

broadcast advertising is permissible. I therefore write separately to explain my views and misgivings on this significant point.

It is important to keep a sharp focus on the real issue in this case. Petitioner Jacoby & Meyers, a national law firm with offices throughout California and New York, is considering opening several branches in New Jersey and wants to operate under its existing name of Jacoby & Meyers. However, our State's disciplinary rules prohibit the mention in the firm name of any lawyer not licensed to practice in New Jersey. *DR* 2–102(C). Neither Mr. Jacoby nor Mr. Meyers is licensed to practice in this state.

Petitioner initiated this action to challenge the constitutionality of our firm name rule. In today's decision the Court has rejected that challenge. I agree with the majority that *DR* 2–102(C) bars petitioner's use of its existing name as its firm name in New Jersey and, as narrowly construed and applied in our decision in this case, is constitutional. The firm name is not truly commercial expression or speech. Rather, it is a quasi-official designation which can be reasonably regulated by the State without encroaching upon protected areas of commercial speech.[1] See *ante* at 87–88. However, I have serious reservations about the wisdom and continued viability of our firm name restriction in this era of multijurisdictional practice and widespread legal advertising. I therefore welcome the majority's decision to refer this matter to a special Supreme Court committee for consideration of whether to change our

---

[1]The majority further holds that "[t]he use of a firm name in New Jersey that includes attorneys not admitted to our bar is certain to deceive at least some consumers of legal services." See *ante* at 86. On an abstract level, that may be so, but I seriously question the pertinency of that proposition. Any potential deception can be dissipated by a simple rule change. I see nothing inherently deceptive about the practice of using a firm name which includes out-of-state lawyers. Certainly, were we to change our rule to permit nonlicensed attorneys to be included in a firm name, we would not be authorizing a deceptive practice. The vast majority of jurisdictions now allows the firm name to follow the firm. In fact, New Jersey is one of only two states which have retained this firm name restriction.

present rule, as well as our State's total ban on broadcast advertising by attorneys.

The majority further states that our firm name restriction presents no barrier to a New Jersey law office advertising its affiliation with a national firm. The New Jersey branch of the firm may note such an association on office signs, professional cards and letterheads, as long as the reference is not misleading. See *ante* at 88. It may also utilize all currently permissible forms of commercial advertising. See *ante* at 88. As far as I am concerned, recognition of the right to advertise affiliation draws the sting from the firm name restriction and constitutes the only basis for its acceptability.

I do not believe the Court is required to confront more than the foregoing propositions. Nevertheless, the Court has felt constrained to address television advertising, which is prohibited under our disciplinary rules. See *DR* 2–102(D) ("A paid advertisement . . . shall be communicated to the public only in print media"). The majority expresses its understandable concern over the fact that Jacoby & Meyers relies heavily on broadcast media advertising and maintains offices in New York, where there is no ban on television and radio advertising by lawyers. It should suffice on this aspect of the case simply to note this fact and the potential conflict which may arise from attempted uses of broadcast advertising by Jacoby & Meyers regarding a New Jersey law firm affiliate.

The Court, for purposes of this case, states that "if petitioner were allowed to use its firm name in New Jersey in *any* form its television advertising [in New York] could give it a substantial competitive advantage [over New Jersey firms]." See *ante* at 88. According to the majority: "Any New Jersey law firm that advertised in print its association with petitioner is likely to gain a real benefit from petitioner's television advertising." *Ante* at 89. In my view, the record in this case is too slim to resolve the fact-sensitive question of whether Jacoby & Meyers' New York television advertising would constitute a direct bene-

fit and unfair trade advantage for itself or its New Jersey branches, at least where the advertising does not mention the name of the firm's New Jersey affiliate. It seems a very debatable proposition that a measurable benefit in New Jersey will accrue to petitioner or its local affiliate if the New Jersey law firm is never mentioned in the New York ads.[2]

Of greater concern than the Court's expressed belief that Jacoby & Meyers' New Jersey affiliate would reap an unfair trade advantage from advertising practices in New York is the cast which its discussion could place on future cases or proceedings which may be more appropriate for determining the permissible scope of attorney broadcast advertising. The majority forewarns Jacoby & Meyers that if it intends to continue running television commercials in New York, it must forego advertising its affiliation with New Jersey firms not only in the broadcast but also in the print media. It serves a similar warning upon any New Jersey firm affiliating with petitioner.

This *in futuro* disposition by the Court necessarily involves speculation on distant problems which are not ripe for a reasoned resolution. *Cf. Clay v. Sun Ins. Office Limited*, 363 *U.S.* 207, 221, 80 *S.Ct.* 1222, 1230, 4 *L.Ed.*2d 1170, 1175 (1960) (Frankfurter, J.) ("[W]e do not remotely hint to an answer to a question that is prematurely put"). Furthermore, in discussing the question of permissible television advertising, the majority addresses an issue with significant constitutional and public policy implications. Such matters should be kept at arms length until their proximity to the heart of the controversy makes hand-to-hand combat with them unavoidable. *Cf. Donadio v. Cunningham*, 58 *N.J.* 309, 325–326 (1971) ("a court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation"). See, *e.g., Ahto*

---

[2]Even the majority has admitted that the extent and intensity of petitioner's New York television advertising is not a matter of record in this case and that the Court has no way of measuring the influence or effect of such advertising. See *ante* at 88.

*v. Weaver,* 39 *N.J.* 418, 428 (1963); *Lordi v. UA New Jersey Theaters, Inc.,* 108 *N.J.Super.* 19, 33 (Ch.Div.1969).

Despite my reservations, I am somewhat mollified because the Court's decision is intended to be temporary. It is made in the context of a potential change in our rules governing this entire subject. Were this not a provisional ruling, our decision might place us on a collision course with the principles enunciated in the United States Supreme Court's latest decision on the scope of legal advertising. See *In the Matter of R. M. J.,* —— *U.S.* ——, 102 *S.Ct.* 929, 71 *L.Ed.2d* 64 (1982). In that decision Justice Powell, writing for a unanimous Court, underscored the point that regulations restricting the right of attorneys to advertise are valid only "where the record indicates that a particular form or method of advertising has in fact been deceptive." *Id.* at ——, 102 *S.Ct.* at 937. Justice Powell further explained that the scope of any such restriction must be "no broader than reasonably necessary to prevent the deception." *Id.* at ——, 102 *S.Ct.* at 937.

This Court is mindful of the great changes which have occurred in the practice of law throughout the country. It is fully aware of the direction which the Supreme Court is taking on attorney advertising. I am confident that we will navigate within the constitutional markers set by the Supreme Court. Such a course would acknowledge that there is nothing inherently deceptive or misleading about television and radio advertising.[3] Moreover, it would recognize that a blanket prohibition

---

[3] The majority refers to the landmark case of *Bates v. State Bar of Arizona,* 433 *U.S.* 350, 97 *S.Ct.* 2691, 53 *L.Ed.2d* 810 (1977), wherein the Supreme Court first declared that lawyers have the constitutional right to advertise their services. See *ante* at 89. In that case, the Court stated in regard to television and radio advertising: "[T]he special problems of advertising on the electronic broadcast media will warrant special consideration." 433 *U.S.* at 384, 97 *S.Ct.* at 2709, 53 *L.Ed.2d* at 836. I agree that television and radio advertising warrant our special concern because those media provide the speaker with a unique opportunity to reach a widespread audience with relative ease. Nevertheless, in my mind, that concern alone may not consti-

against such advertising may sweep more broadly than necessary to effectuate the State's legitimate ends.[4]

In the wake of the *R. M. J.* decision, questions have surfaced not only as to the continued constitutional validity of our State's total ban on television and radio advertising by lawyers but also as to its desirability as a matter of policy. At least 39 other states, plus the District of Columbia, now allow attorneys to advertise on television or radio in some form. See Andrews, "Lawyer Advertising and the First Amendment," 1981 *Am. B. Foundation Research J.* 967, 1014–1015; "Lawyer Takes To T.V.," 109 *N.J.L.J.* 183 (1982). In addition, the new ABA Model Rules of Professional Conduct provide that lawyers may advertise their services through public media, including radio and

---

tute sufficient justification for a total ban on television and radio advertising by lawyers.

[4]Of course, the State may place reasonable time, place and manner restrictions on attorney advertising. See *Bates; In re Ethics Opinion 447*, 86 *N.J.* 473 (1981). However, the mere fact that *DR* 2–101(D) restricts only the manner of advertising, rather than its content, does not mean the State's regulation may sweep more broadly than necessary in restricting the manner of advertising. See, *e.g., In the Matter of R. M. J.*, —— *U.S.* ——, 102 *S.Ct.* 929, 71 *L.Ed.* 64 (1982) (rule prohibiting attorneys from mailing announcement cards to persons other than lawyers, former clients, relatives or friends held unconstitutional); *Koffler v. Joint Bar Association*, 51 *N.Y.*2d 140, 412 *N.E.*2d 927, 432 *N.Y.S.*2d 872 (1980) (attorney mass mailings to real estate owners and brokers found constitutionally protected); *In re Appert*, 315 *N.W.* 2d 204 (Minn.Sup.Ct.1981) (lawyer advertising through distribution of brochures and letters protected under First Amendment).

Moreover, by prohibiting lawyers from advertising on television and radio, it can certainly be argued that New Jersey has denied attorneys access to the most effective means of commercial advertising. As the Supreme Court has noted in the context of political speech: "[The public's] increasing dependence on television, radio and other mass media for news and information has made these expensive modes of communication indispensible instruments of effective . . . speech." *Buckley v. Valeo*, 424 *U.S.* 1, 19, 96 *S.Ct.* 612, 635, 46 *L.Ed.*2d 659, 688 (1976). See generally Mastro, Costlow and Sanchez, "Taking the Initiative: Corporate Control of the Referendum Process Through Mass Media Spending and What to Do About It," 32 *Fed.Comm.L.J.* 315 (1980).

television. See *Rule* 7.2(a), ABA Model Rules of Professional Conduct (Alt.Draft 1981). Thus, *DR* 2–101(D) may be constitutionally vulnerable; it may not comport with current public policy; and, assuredly, it is ripe for reconsideration.

I recognize the majority's sincere conviction that something be said about the rule's present application. However, I have a lingering concern about the effect of this ruling on petitioner's otherwise permissible advertising practices. As already mentioned, a New Jersey firm may freely advertise its association with a national law firm, as long as that advertising is not deceptive or misleading. See *ante* at 88. Nevertheless, the Court rules today that such nonmisleading advertising can be banned simply because the national law firm simultaneously exercises television advertising rights allowed it in another state, even though that advertising makes no reference to the firm's New Jersey affiliate. This ruling tends to contradict the Court's basic rationale for sustaining the firm name restriction—that New Jersey lawyers can fully advertise their associations with national firms. However, I do not surmise that, even in the immediate future while our rules are being studied anew, this Court will prohibit reasonable, nondeceptive advertising or deny lawyers the right to contest any adverse restrictions placed upon permissible advertising efforts.

I would see no need to comment on the subject of attorney television advertising in this case were it not for the Court injecting the issue into its decision. I would much prefer to be able to consider these problems either in a more appropriate case raising these issues on an adequate record or in a rulemaking proceeding which seeks the formulation of an appropriate regulation.

To the extent the majority's decision may be thought to be an imprimatur on our current strictures against television advertising, I merely want to state that I do not think this is so and to suggest that our rules may not be deserving of a vigorous

defense.[5] The Court itself recognizes that we may be out of step with the times and should consider bringing our attorney advertising rules into conformity with the rest of the country. *Ante* at 96–97. See "Living Up to the First Amendment," 109 *N.J.L.J.* 204 (1982); Andrews, *supra*, 1981 *Am. Foundation Research J.* at 1020–1021. I fully expect the special committee entrusted with the task of reviewing this subject matter—and then this Court in due time and with an adequate record—to propose and adopt rules which are constitutional and solicitous of the public and the profession. I would therefore await a more suitable case or proceeding than this one for determining the right of attorneys to advertise on television and radio.

HANDLER, J., *concurring in the result and dissenting in part.*

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*For reversal*—None.

---

[5]As a recent editorial in the *New Jersey Law Journal* noted:
> [I]t is clear that purely dignitary limitations can no longer be imposed upon lawyer advertising. The freedom that attaches to other, like-situated commercial speakers now attaches to members of the bar. Perhaps that is exactly as it should be. We are, after all, a nation that stakes its best hopes on untrammeled expression. ["Living Up to the First Amendment," 109 *N.J.L.J.* 204 (1982)]