# IN THE MATTER OF ROBERT A. FELMEISTER AND HANAN M. ISAACS, ATTORNEYS AT LAW.

Argued September 13, 1983—Decided February 29, 1984.

*Harold L. Rubenstein* argued the cause for complainant Disciplinary Review Board (*Colette A. Coolbaugh,* Counsel, attorney).

*David B. Rubin* argued the cause for respondents (*Rubin & Rubin,* attorneys; *Robert A. Felmeister* and *Hanan M. Isaacs,* pro se, on the briefs).

The opinion of the Court was delivered by

SCHREIBER, J.

This attorney disciplinary proceeding comes before us on respondents' motion to dismiss the charges on the ground that the Disciplinary Rule barring broadcast advertising, *DR* 2–101(D), is unconstitutional. Respondents concede that they intentionally violated *DR* 2–101(D) by radio advertisements, though fully cognizant that at that time we were reviewing the Rule and considering amendments to it. They contend that irrespective of our ongoing proceedings, their violations are of no consequence. We reject this contention and deny their motion.

Procedurally this matter commenced when the Division of Ethics and Professional Services filed with the District VII Ethics Committee two complaints alleging violations of *DR* 2–101(D), *DR* 1–102(A)(1) and (6), each naming one respondent. In accordance with *R.* 1:20–4(d), (i), both respondents, members of the New Jersey bar, moved for leave to seek interlocutory review of their constitutional challenges to the proceedings pending before the District Ethics Committee. We granted the motions and set the matters down for oral argument. We denied the respondents' motions for summary disposition and now consider their motions to dismiss.

Under these circumstances we assume that the facts alleged in the complaints are true. These complaints disclose the following: Respondents Felmeister and Isaacs, who were admitted to the bar in 1978 and 1980, respectively, are partners in a law practice in Princeton Junction. On November 4, 1982, they wrote to the Supreme Court's Advisory Committee on Professional Ethics (Advisory Committee) advising the Committee that *DR* 2–101(D),[1] "which creates a blanket ban on radio and television advertising by lawyers," was unconstitutional and that they had "scheduled radio advertisements of our services to commence on December 6, 1982." The letter concluded with the following paragraph:

> It is our feeling that any efforts to restrain our use of radio as a medium for advertising our services would be violative of the state and federal constitutions. However, we invite your opinion as to the correctness of our position on the issue of broadcast media advertising by lawyers. If you wish to discuss this matter,

---

[1]*DR* 2–101(D) then provided:

> A lawyer shall not compensate or give anything of value to a representative of the press, radio, television, or other communication medium in anticipation of or in return for professional publicity in a news item. A paid advertisement must be identified as such unless it is apparent from the context that it is a paid advertisement, and shall be communicated to the public only in print media. A copy of the paid advertisement shall be approved by the lawyer prior to its publication and shall be retained by him for 3 years after publication.

please feel free to contact us. Your comments or other action will be expected, if at all, *before* December 1, 1982.

The Division of Ethics and Professional Services (Division) responded in a letter dated November 9, 1982 that the Committee would not be acting on inquiries relating to attorney advertising until the Supreme Court Committee on Attorney Advertising (Advertising Committee) has reported to the Supreme Court. The Advertising Committee had been appointed in July, 1982 to evaluate and make recommendations to the Court on appropriate rules and guidelines to govern advertising by attorneys in this state. One of three specific areas that the Advertising Committee was directed to explore was the continued prohibition on radio and television advertising.[2] Respondents were advised that their letter was being forwarded to the Advertising Committee.

The Division's letter also referred to this Court's opinion in *In re Professional Ethics Advisory Comm. Opinion 475,* 89 *N.J.* 74, app. dism. *sub nom. Jacoby & Meyers v. Supreme Court of New Jersey,* 459 U.S. 962, 103 *S.Ct.* 285, 74 *L.Ed.*2d 272 (1982). The issue in that case was the ban on the use of firm names that included the names of persons who were not members of the New Jersey bar. *DR* 2–102(C). In that opinion we acknowledged a related issue concerning television advertising and stated that the Rule banning radio and television advertising should be explored in "a full hearing on all points of view and an in-depth investigation of the underlying interests" would be undertaken. 89 *N.J.* at 96. The Advertising Committee was created following *Opinion 475.*

The Advertising Committee arranged for respondents to appear before it on November 18, 1982 during public hearings.

---

[2]The Committee was requested to consider appropriate guidelines relating to firm names utilized by attorneys practicing in New Jersey and the need for additional or more precise rules relating to advertisements that indicate a specialty or expertise. The Committee also had a general mandate to evaluate and make recommendations to the Supreme Court on appropriate rules and guidelines to govern advertising by attorneys.

Neither respondent appeared. Instead, on November 24, 1982, respondents wrote to the Division that given the Advisory Committee's decision to refuse to answer inquiries concerning the radio ban on advertising, the respondents had decided to go forward with the radio advertisements. On December 6 and 7, 1982, respondents sponsored five radio broadcasts advertising the services of their law firm, and by their own admission intentionally and willfully violated the Supreme Court's Disciplinary Rule. Immediately thereafter the Division prepared and filed the complaints. Upon receipt of the complaints, respondents suspended their commercial broadcasts.

Each complaint contained three counts. The first charged the defendants with a willful and deliberate violation of the ban on radio advertising and with violations of *DR* 2–101(D), *DR* 1–102(A)(1) and (6). The second claimed that defendants scheduled advertisements throughout December, 1982, including December 8, 9 and 12, and that the scheduling constituted a willful and deliberate violation of the same Disciplinary Rules. The third count asserted that the intentional action to proceed with the radio advertising in the face of this Court's explicit warning was contemptuous of the Supreme Court's rulemaking and decisional authority in violation of *DR* 1–102(A)(1), (5) and (6).

I

■ Respondents' precipitous action is probably due in no small part to their misunderstanding of the nature of the first amendment's applicability to an attorney's right to advertise. Relying upon *Elrod v. Burns,* 427 *U.S.* 347, 96 *S.Ct.* 2673, 49 *L.Ed.*2d 547 (1976), they claim that the loss of first amendment freedoms for even minimal periods of time constitutes irreparable injury and is impermissible. Such reliance is misplaced. *Elrod v. Burns* concerned the protection of political expression, and the Supreme Court, in holding that a preliminary injunction was warranted, referred to the importance of the "timeliness of political speech." *Id.* at 374 n. 29, 96 *S.Ct.* at 2690 n. 29, 49 *L.Ed.*

2d at 566 n. 29. However, commercial speech is subject to different restraints and restrictions. The first amendment protection attributable to commercial speech is founded essentially on the public's right to be informed, and, in the case of attorney advertising, to be informed of the availability, nature and prices of legal services. *Bates v. State Bar of Arizona,* 433 *U.S.* 350, 97 *S.Ct.* 2691, 53 *L.Ed.2d* 810 (1977). Regulation of commercial speech with respect to its content, quality, time, place and manner is permissible.

Justice Pashman in *In re Professional Ethics Advisory Comm. Opinion 475, supra,* 89 *N.J.* at 83–84, summed up the difference between political and commercial speech as follows:

[T]he Supreme Court has never equated commercial speech with political expression. Our society values political expression as an inherent part of the democratic process. Commercial speech, in contrast, is valued and constitutionally protected only to the extent that it conveys facts which facilitate honest commercial transactions. With that in mind, both the U.S. Supreme Court and this Court have said "there can be no constitutional objection to the suppression of commercial messages ... more likely to deceive the public than inform it." *In re Professional Ethics Opinion 447,* 86 *N.J.* 473, 477 (1981), quoting *Central Hudson Gas v. Public Service Comm'n,* 447 *U.S.* 557, 563, 100 *S.Ct.* 2343, 2350, 65 *L.Ed.2d* 341 (1980). Moreover, "a different degree of protection is necessary to insure that the flow of the truthful and legitimate commercial information is unimpaired." *Virginia Pharmacy,* 425 *U.S.* at 771, n. 24, 95 *S.Ct.* at 1830, n. 24.

It was not until *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 *U.S.* 748, 96 *S.Ct.* 1817, 48 *L.Ed. 2d* 346 (1976), that commercial speech was clearly placed under the umbrella of the first amendment. In *Virginia Pharmacy,* the Supreme Court struck down a statute prohibiting the advertising of prescription drugs. The Court held that the linchpin of the first amendment rationale was the consumer's interest in the dissemination of information so that his economic decision could be intelligent and well informed. "To this end, the free flow of commercial information is indispensable." *Id.* at 765, 96 *S.Ct.* at 1827, 48 *L.Ed.2d* at 360. Untruthful, deceptive or misleading statements were not protected. Commercial infor-

mation was to flow cleanly as well as freely. *Id.* at 771–72, 96 *S.Ct.* at 1830–31, 48 *L.Ed.*2d at 364–65.

The majority opinion in *Virginia Pharmacy* cautioned that:

[A]lthough we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional services of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising. [*Id.* at 773 n. 25, 96 *S.Ct.* at 1831 n. 25, 48 *L.Ed.*2d at 365 n. 25.]

The development of the law with respect to attorney advertising commenced only recently and the Supreme Court has been gradually filling in the interstices in this field. In 1977 the Supreme Court was faced in *Bates v. State Bar of Arizona, supra,* with the question of the validity of an Arizona Supreme Court rule that banned newspaper advertising by members of the bar. The heart of the dispute was whether lawyers may constitutionally advertise the prices at which certain routine services would be performed. The Court answered the question in the affirmative. *Bates, supra,* 433 *U.S.* at 384, 97 *S.Ct.* at 2709, 57 *L.Ed.*2d at 836. Significantly, however, the Court refused to employ the overbreadth doctrine, which permits an attack on overly broad statutes without a showing that the specific conduct of the attacker was protected. The overbreadth doctrine, available in first amendment political speech cases, reflects the policy that it is preferable to permit unprotected speech rather than chill protected speech. Because of the economic nature and durability of commercial speech, the justifications for that policy are not present in attorney advertising. This is because commercial well-being is unlikely to be crushed by overbroad regulation, and the advertiser presumably can determine more readily than others whether his speech is truthful and protected. *Id.* at 379–81, 97 *S.Ct.* at 2707, 53 *L.Ed.*2d at 833–34.

Moreover, the *Bates* opinion continued, advertising by lawyers is properly subject to regulation. Thus, advertising that is false, deceptive or misleading is subject to restraint. "[T]he leeway

for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena." *Id.* at 383, 97 *S.Ct.* at 2709, 53 *L.Ed.2d* at 835. The Court alluded to the peculiar concerns related to advertising legal services. It noted that advertising as to the quality of services is not susceptible of "measurement or verification" and that "such claims may be so likely to be misleading as to warrant restriction." *Id.* at 383–84, 97 *S.Ct.* at 2709, 53 *L.Ed.2d* at 835–36. The Court concluded:

> In sum, we recognize that many of the problems in defining the boundary between deceptive and nondeceptive advertising remain to be resolved, and we expect that the bar will have a special role to play in assuring that advertising by attorneys flows both freely and cleanly. [*Id.* at 384, 97 *S.Ct.* at 2709, 53 *L.Ed.2d* at 836.]

The Court in *Bates* also pointed out that it was not passing upon in-person solicitations. *Ibid.* These matters were taken up in 1978 in two opinions, *Ohralik v. Ohio State Bar Ass'n,* 436 *U.S.* 447, 98 *S.Ct.* 1912, 56 *L.Ed.2d* 444 (1978) (upholding prohibition of attorney in-person harmful solicitation for pecuniary gain), and *In re Primus,* 436 *U.S.* 412, 98 *S.Ct.* 1893, 56 *L.Ed.2d* 417 (1978) (permitting in-person solicitation involving political expression and no pecuniary gain).

In 1982 the Supreme Court discussed the constitutionality of a Missouri Supreme Court rule governing an attorney's advertisements placed in newspapers and in the yellow pages of the local telephone directory. *In re R.M.J.,* 455 *U.S.* 191, 102 *S.Ct.* 929, 71 *L.Ed.2d* 64 (1982). The Court substantially adopted its analysis in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 *U.S.* 557, 100 *S.Ct.* 2343, 65 *L.Ed.2d* 341 (1980), in which it had struck down a regulation banning a public utility from promotional advertising. The *Central Hudson* approach contained a four-part inquiry. First, the court must determine whether the commercial speech concerns lawful activity and is not misleading. Second, it must decide whether the governmental interest asserted in support of the regulation is substantial. Third, if the answers to these questions are affirmative, then the court must determine whether the regulation directly ad-

vances the governmental interest. Fourth, it must then decide whether the regulation is more extensive than is necessary to serve that interest. *Id.* at 566, 100 *S.Ct.* at 2351, 65 *L.Ed.*2d at 351. *See generally* Note, "Constitutional Protection of Commercial Speech," 82 *Colum.L.Rev.* 720 (1982) (discussing the development and current status of constitutional protection for commercial speech).

The Court in *R.M.J.* explained its approach to professional commercial advertising as follows:

> Commercial speech doctrine, in the context of advertising for professional services, may be summarized as follows: Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions. Misleading advertising may be prohibited entirely. But the States may not place an absolute prohibition on certain types of potentially misleading information, e.g., a listing of areas of practice, if the information also may be presented in a way that is not deceptive. Thus, the Court in Bates suggested that the remedy in the first instance is not necessarily a prohibition but preferably a requirement of disclaimers or explanation. [433 *U.S.* at 375, 97 *S.Ct.* at 2704, 53 *L.Ed.*2d at 830.] Although the potential for deception and confusion is particularly strong in the context of advertising professional services, restrictions upon such advertising may be no broader than reasonably necessary to prevent the deception. [455 *U.S.* at 203, 102 *S.Ct.* at 937, 71 *L.Ed.*2d at 74.]

*R.M.J.* cautioned, however, that applying the *Central Hudson* formulation to rules governing advertising of professional services must be done "with the understanding that the special characteristics of such services afford opportunities to mislead and confuse that are not present when standardized products or services are offered to the public." *Id.* at 203 n. 15, 102 *S.Ct.* at 938 n. 15, 71 *L.Ed.*2d at 74 n. 15.

The problem of formulating appropriate standards governing attorney advertising is compounded by the special treatment necessary for broadcasts and telecasts. *Bates* referred to the "special problems of advertising on the electronic media." 433 *U.S.* at 384, 97 *S.Ct.* at 2709, 53 *L.Ed.*2d at 836. In *Metromedia, Inc. v. San Diego,* 453 *U.S.* 490, 501, 101 *S.Ct.* 2882, 2889, 69 *L.Ed.*2d 800, 811 (1981), the Supreme Court, in discussing and

invalidating a municipal ordinance banning most billboard advertising, remarked: "Each method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of each method. We deal here with the law of billboards." *See also Federal Communications Comm'n v. Pacifica Found.*, 438 *U.S.* 726, 748, 98 *S.Ct.* 3026, 3039, 57 *L.Ed.2d* 1073, 1092 (1978) ("We have long recognized that each medium of expression presents special First Amendment problems."); *Southeastern Promotions v. Conrad,* 420 *U.S.* 546, 557, 95 *S.Ct.* 1239, 1246, 43 *L.Ed.2d* 448, 458 (1975) ("Each medium of expression * * * must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems.").

It can be understood from this brief review of the Supreme Court opinions that the development of an attorney's right to advertise as a facet of commercial speech under the first amendment is of recent vintage, has been undergoing gradual explication, and requires special care to balance the State's interest in regulating an attorney's conduct against the public's right to information concerning attorneys' services, particularly in the broadcast and telecast area. We are sensitive to the unique qualities of radio and telecast advertising. Radio and television advertising reach a wider audience than does print advertising, and that audience includes a substantial number of less educated consumers who are not exposed to other media. *Legal Department, National Association of Broadcasters, Advertising by Lawyers: A Broadcaster's Perspective* 12–16 (1978). Television has become one of the most potent and popular of all advertising media, in part because of its unique "show and tell" capabilities. *Id.* at 33. Advertisers expect to achieve maximum persuasive effects from a fleeting exposure of the message sometimes with a potential subliminal impact on the audience. In radio and television broadcasting the volume, quality and intonation of voices can create ambiguities or convey nuances in meaning. Music, sound effects and dramatization are additional broadcasting techniques that may color the message conveyed to the

listener.[3] These radio and television advertising variables, which carry subtle messages of their own, are difficult to monitor or even measure. *Report of the Supreme Court Committee on Attorney Advertising* 18, 111 *N.J.L.J.* (May 5, 1983) (Minority Report).

We did not sit idly by since *Bates,* but amended our Disciplinary Rules to permit advertisements in the print media. *DR* 2–101(D). Further elucidation in the Supreme Court's opinion in *R.M.J., supra,* of the constitutional right of attorneys to advertise was brought to our attention, and the proceeding in *In re Professional Ethics Advisory Comm. Opinion 475, supra,* prompted us to give further consideration to our advertising rules. We noted in that opinion that "it would be wrong to alter existing rules, and the legitimate expectations they create, without an understanding of what effects the changes may have. We therefore need a thorough review and study." 89 *N.J.* at 79. In the opinion, as we previously indicated, we declined to pass on the wisdom of our ban on television advertising and decided to submit that problem, as well as radio broadcasting, to a Supreme Court Committee whose report and recommendation were to be completed, if possible, by January 1, 1983. 89 *N.J.* at 78–79. It is significant that respondents, despite this information, proceeded to commence broadcasts in December, 1982.

The Advertising Committee held public hearings, studied the case law and analyzed many articles, rules and statistical studies. After completion of its intensive investigation and deliberation, the Advertising Committee was seriously divided on the

---

[3]One writer commented:

Television producers sell "realistic" and "atmospheric" mood photography, montage effects, use of succession of still shots of puppets to produce "animation"—all techniques designed to transport the viewer out of his normal, hardheaded buying attitude into a world that, because of the suspension of belief, is more "real" than the real world, and within which buying the advertised brand is linked to the fulfilment of the viewer's idealized self-image. [Bensman, "The Advertising Agency Man in New York," in *Media Sociology: A Reader* 213 (J. Tunstall ed. 1970).]

desired extent of regulation of attorney broadcast advertising. Its report and recommendations were published thereafter and comments from the bar were requested. We have now completed our review and modified our Disciplinary Rules to permit broadcasting (both radio and television) subject to certain limitations and guidelines. *See* 113 *N.J.L.J.* 15–16 (January 26, 1984).

## II

The primary issue here is not the constitutionality of the Rule, as our dissenting colleague asserts. Rather, the question is the Court's responsibility and authority to assure that its rules of conduct for attorneys are obeyed by all—even while they are under challenge. In a situation such as this, when a rule is being studied by the Court, an attorney has an obligation to abide by our existing Disciplinary Rule, *DR* 2–101(D), prohibiting radio broadcasting. Therein lies the central point of difference with our dissenting colleague. To ignore a violation of the Rule would be inequitable and unjust to the members of the bar who respect our traditions, who abide by our Disciplinary Rules, and who understand the necessity of observing the Rule while it is in the process of revision or is being challenged. It would also be competitively unfair to those attorneys abiding by the Rule and refraining from radio advertising.

There is a value in assuring orderly change when a Disciplinary Rule is being revised whether because of alleged illegality or for asserted improvement. If all or a substantial number of attorneys were to disregard the Rule during this period, we would have chaos. Intentional violation of the Disciplinary Rule constitutes conduct "prejudicial to the administration of justice." *DR* 1–102(A)(5). Here, only one firm consisting of two lawyers had intentionally violated *DR* 2–101(D), a fact that persuades us that the profession overwhelmingly recognized the importance of compliance and, unlike the respondents, have due regard for the public interest in orderly change.

It must be remembered that respondents were not subject to a total advertising ban. They were free to advertise in the print media. Several newspapers covered the listening area of the radio station. *Cf. Capital Broadcasting Co. v. Mitchell,* 333 *F.Supp.* 582, 585–86 (D.D.C.1971) ("rational basis [exists] for placing a ban on cigarette advertisements on broadcast facilities while allowing such advertisements in print" because the public owns the airwaves and "[i]t is difficult to calculate the subliminal impact of [broadcast messages]"), aff'd *sub nom. Capital Broadcasting Co. v. Kleindienst,* 405 *U.S.* 1000, 92 *S.Ct.* 1289, 31 *L.Ed.2d* 472 (1972).

Moreover, keeping in effect our prohibition against radio advertising during the interim served the distinct strong interest of this Court to protect against deceptive and misleading advertising. Without some type of monitoring and retention of records, enforcement against misleading statements or those likely to cause a member of the public to harbor an unjustifiable expectation would not have been feasible. Indeed, we had no monitoring or administrative organization in place for broadcast advertising when respondents advertised over the radio.[4]

Until an alternative regulatory scheme could be adopted, the least restrictive means to achieve the State's goals of developing a new regulation without totally foregoing its obligation to regulate attorney practice was for this Court to enforce the existing Disciplinary Rule. A somewhat similar situation arose in *Consumers Union v. American Bar Ass'n,* 427 *F.Supp.* 506 (E.D.Va.1976), aff'd in part *sub nom. Supreme Court of Virginia v. Consumers Union,* 446 *U.S.* 719, 100 *S.Ct.* 1967, 64 *L.Ed.2d* 641 (1980). In that case, the district court permitted an attorney advertising disciplinary rule, which was being constitutionally

---

[4]Our new rules contain guidelines for radio and television advertising. *DR* 2–101(A). A recording of the broadcast must be retained for three years. *DR* 2–102(B). An advisory committee is available to assist lawyers who have questions as to the propriety of particular advertisements. *See DR* 2–101 comment, 113 *N.J.L.J.* 15–16 (January 26, 1984).

challenged, to remain in effect while professional organizations studied possible amendments to the rule. Consumers Union had commenced the action in February, 1975 seeking a permanent injunction against the enforcement and operation of the disciplinary rule, which restricted the types of information and directory for attorney advertising, 446 *U.S.* at 725–26, 100 *S.Ct.* at 1971, 64 *L.Ed.*2d at 649. At the hearing seven months later, the court granted defendants' motion for a continuance until March, 1976 based on their representations that the American Bar Association (ABA) and the Virginia State Bar Association (State Bar) were preparing amendments to the rule, which might resolve the controversy.[5] *Id.* at 726, 100 *S.Ct.* at 1971, 64 *L.Ed.*2d at 650 (referring to 427 *F.Supp.* at 513–16). The ABA adopted an amendment in February, 1976, and the district court granted a second continuance to allow more time for the Virginia Supreme Court and State Bar to consider amending the state's disciplinary rule. *Ibid.*

 Even when statutes have been held to be unconstitutional, enforcement thereafter during an interim period for good and sufficient reason is permissible. *See Salorio v. Glaser,* 93 *N.J.* 447, 467–68 (1983) (setting prospective effective date for enforcement of judgment invalidating Emergency Transportation Tax Act so that "[t]he State should be afforded a reasonable period of time to devise alternative * * * solutions"), *cert.* denied, —— *U.S.* ——, 104 *S.Ct.* 486, 78 *L.Ed.*2d 682 (1983), and cases cited therein.

The respondents could have challenged the constitutionality of the Disciplinary Rule in a suit for a declaratory judgment. Uniform Declaratory Judgments Law, *N.J.S.A.* 2A:16–50 to –62;[6] *see also American Trial Lawyers v. New Jersey Supreme*

---

[5]In July, 1975, the Council of the State Bar appointed a special committee on advertising to study the disciplinary rules. 427 *F.Supp.* at 511–12.

[6]Our policy has strongly favored use of declaratory judgment proceedings to challenge the validity of statutes or regulations rather than prosecutions

*Court*, 66 *N.J.* 258, 267 (1974) (upholding constitutionality of contingent fee rule, *R.* 1:21–7: "Our rules are never immutable. Applications for their review are never foreclosed."); *In re National Broadcasting Co.*, 64 *N.J.* 476 (1974) (modifying Canon 35 of the Canon of Judicial Ethics to allow artist sketching of courtroom scenes); *Busik v. Levine*, 63 *N.J.* 351 (1973) (disputing the validity of *R.* 4:42–11(b) promulgated by the Court under its rulemaking authority), app. dism., 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.2d* 733 (1974). To seek a declaration of the constitutionality of *DR* 2–101(D), respondents should demonstrate that they had a justiciable controversy by alleging that their proposed advertisements were not misleading or deceptive and were protected commercial speech. *See New Jersey Turnpike Auth. v. Parsons*, 3 *N.J.* 235, 239–40 (1949); *Durham v. Brock*, 498 *F.Supp.* 213, 216–18 (M.D.Tenn.1980), aff'd, 698 *F.*2d 1218 (6th Cir.1982).

Respondents, however, chose not to seek a declaratory judgment but to violate the mandate of the Court. Despite being fully aware of the Rule and its meaning, the respondents intentionally violated it. *Cf. In re Hinds*, 90 *N.J.* 604, 630–31 (1982) (where the conduct proscribed by the Rule, which involved political as distinguished from commercial speech, was ambiguous and the disciplinary restriction was not expressly brought to the attention of the attorney before his conduct occurred). We do not view their actions as being substantially different from those of individuals who violate a court order and then seek to raise the unconstitutionality of the injunction as a defense to prosecution for the violation. Unconstitutionality is not a defense. For example, in *Walker v. Birmingham*, 388 *U.S.* 307, 320, 87 *S.Ct.* 1824, 1831, 18 *L.Ed.2d* 1210, 1219 (1967), the Supreme Court upheld the conviction of civil rights demonstrators for violating an *ex parte* injunction issued to enforce an ordinance prohibiting parading or demonstrating without a li-

for violations. *See, e.g., State v. Baird*, 50 *N.J.* 376, 378–79 (1967); *Lucky Calendar Co. v. Cohen*, 19 *N.J.* 399, 409 (1955).

cense. The Supreme Court held that the ordinance's unconstitutionality was unavailable as a defense. The Court stressed that the defendants knowingly had failed to pursue available judicial remedies and upheld their criminal convictions, stating that, "in the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives * * *. [R]espect for judicial process is a small price to pay for the civilizing hand of law * * *." *Id.* at 320–21, 87 *S.Ct.* at 1831–32, 18 *L.Ed.*2d at 1219–20 (footnote omitted). *See generally* Blasi, "Prior Restraints on Demonstrations," 68 *Mich. L.Rev.* 1481, 1536–52 (1970) (discussing judicial review of restraints on political speech).

For several reasons, upholding the directive of the Disciplinary Rule, despite its alleged constitutional infirmity, is fair. Of primary importance is the strong public interest in the administration of the justice system. The Rule, like an injunction, clearly defined the conduct prohibited and the group enjoined. Additionally, as previously observed, judicial remedies of review were clearly established so that an acceptable method to challenge the restriction of conduct was available. Under these circumstances it is not unreasonable to expect attorneys to abide by the Rule and, if desired, to challenge it through an appropriate judicial procedure.

We have previously adverted to the Supreme Court's position that the overbreadth doctrine is not available in an attorney's commercial speech context. Respondents have challenged the constitutionality of the Disciplinary Rule on its face, essentially as being overbroad. They have not shown that the regulation is unconstitutional as applied to them. In the absence of an examination of the respondents' particular communication, one cannot determine if that communication is deceptive or misleading and therefore not entitled to first amendment protection. It is in this sense that the overbreadth doctrine applies. To the extent, therefore, that their challenge is limited by the overbreadth doctrine, it fails, since this Court is not

obliged to confront overbreadth challenges to attorney advertising regulations. *See Bates, supra,* 433 *U.S.* at 380–81, 97 *S.Ct.* at 2707, 53 *L.Ed.2d* at 833–34; see *also Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 *U.S.* 489, 496–97, 102 *S.Ct.* 1186, 1192, 71 *L.Ed.2d* 362, 370 (1982) (overbreadth doctrine does not apply to commercial speech). Indeed, respondents may not question the alleged facial invalidity of *DR* 2–101(D) in a proceeding charging them with a violation of that Rule.

### III

This Court has a solemn obligation to regulate the legal profession, which includes promulgating and enforcing Disciplinary Rules. The Supreme Court observed in *Ohralik, supra,* 436 *U.S.* at 460, 98 *S.Ct.* at 1920, 56 *L.Ed.2d* at 456, that "[i]n addition to its general interest in protecting consumers and regulating commercial transactions, the State bears a special responsibility for maintaining standards among members of the [legal] profession[ ]." We understand that responsibility and only recently stated: "The Court's responsibility in regulation of the state bar is fundamental. We have plenary and exclusive control over both admission to the bar and the practice of law. We seek to exercise that control in the interests of the public." *In re Professional Ethics Advisory Comm. Opinion 475, supra,* 89 *N.J.* at 79.

In the scheme of things respondents' conduct, contrary to the viewpoint of the dissent, *post* at 450, is not innocuous, but the policy expressed herein is of substantial importance in the administration of justice. We pause to note that there are gradations of importance of free speech. We previously observed the substantial differences between political and commercial speech and among types of commercial speech. Here, the entire bar of more than 22,000 lawyers has obeyed the rule prohibiting broadcast advertising while the Supreme Court was determining what changes should be made. One law firm consisting of two lawyers did not have the patience to wait and

advertised on the local radio, exercising free speech for its own benefit and serving no great public interest since the advertisements could have been inserted in the local press. Such speech would seem to be somewhere near the bottom of the values that free speech is intended to protect.

As officers of the Court, attorneys have a peculiar position with respect to the judicial process and compliance with the expressed or stated law. Respect for the law should be more than a platitude. See In re Addonizio, 95 N.J. 121 (1983). It would be anomalous indeed to permit attorneys unnecessarily to flout regulations of this Court governing their conduct. The respondents' motions for dismissal are therefore denied, and the matters remanded for further proceedings to the District VII Ethics Committee.[7]

HANDLER, J., dissenting.

The respondents in this case have consistently asserted that the Supreme Court's total ban on broadcast media advertising of attorneys' professional services, DR 2-101(D), is unconstitutional. The present proceedings before this Court seek the meritorious review of these constitutional challenges. Ante at 433. The Court, however, does not deal with these constitutional claims. Rather, it decides only that respondents should be subjected to formal discipline for the violation of DR 2-101(D).

In refusing to deal with the constitutionality of the ban on advertising while at the same time authorizing the imposition of discipline for its violation, the Court acts on the premise that a constitutional determination is unnecessary. It apparently believes that a constitutional adjudication is obviated in light of the replacement of our ban on broadcast media advertising with a new rule that allows such advertising subject to reasonable

---

[7]On the remand it would be proper to consider the contents of the radio broadcasts to ascertain whether they contained any false, fraudulent, misleading or deceptive statement or claim. If this appears to be so, the complaint should be amended and notice given to the respondents. See DR 2-101.

regulations. *Ante* at 442. The Court also apparently feels that a constitutional adjudication in this case is irrelevant to, and has no bearing on, the propriety of disciplinary action. *Ante* at 443–446.

If the constitutionality of the total ban were the only issue here, the replacement of the ban with a new rule allowing regulated advertising could justify the avoidance of a constitutional adjudication. The constitutionality of the total ban, however, is not the sole question on this appeal. In view of the Court's decision—to remand the case to determine whether respondents should be sanctioned for their failure to comply with that ban—the case has been transposed into a disciplinary proceeding.

The constitutionality of the particular disciplinary rule can make a great deal of difference in determining whether discipline is needed or appropriate. *E.g., In re Rachmiel,* 90 *N.J.* 646 (1982); *In re Hinds,* 90 *N.J.* 604 (1982). This is especially true in a case such as this in which discipline trenches upon important constitutional rights that are protected under the First Amendment. *Id.; In re R.M.J.,* 455 *U.S.* 191, 102 *S.Ct.* 929, 71 *L.Ed.2d* 64 (1982); *Bates v. State Bar of Arizona,* 433 *U.S.* 350, 97 *S.Ct.* 2691, 53 *L.Ed.2d* 810 (1977).

In this case, I have little doubt that the Court's former total ban on broadcast advertising violated the protections of the First Amendment. *In re Professional Ethics Advisory Comm. Op. 475,* 89 *N.J.* 74, 97 (Handler, J., concurring in part and dissenting in part), app. dism. *sub nom. Jacoby & Meyers v. Supreme Court of N.J.,* 459 *U.S.* 962, 103 *S.Ct.* 285, 74 *L.Ed.2d* 272 (1982). The unconstitutionality of the rule, in light of the protectable interests of free speech with which it conflicts, is a highly relevant factor in determining whether the imposition of discipline for its violation is a sound and appropriate exercise of our regulatory authority.

By authorizing discipline in this case, the Court confirms the misgivings I expressed in *In re Professional Ethics Advisory*

*Comm. Op. 475.* I was evidently mistaken when I stated that I did not think the Court's decision in that case constituted "an imprimatur on our current strictures against television advertising." *Id.* at 103. I thought that "while our rules are being studied anew, this Court [would not] prohibit reasonable, nondeceptive advertising or deny lawyers the right to contest any adverse restrictions placed upon permissible advertising efforts." *Id.* I believed then—and I am convinced now—that our previous rules imposing a total ban on broadcast advertising were unconstitutional and would not be "deserving of a vigorous defense." *Id.* at 103–04 (footnote omitted). The point I would emphasize is "that there is nothing inherently deceptive or misleading about television and radio advertising." *Id.* at 101 (footnote omitted). Consequently, I do not think these particular rules should be applied now as offensive disciplinary weapons.

We have expended considerable energy on the important task of fleshing out new professional advertising rules, articulating standards with greater realism and understanding, defining guidelines with more clarity and precision, developing an administrative machinery for effective regulation, and creating a climate that will foster compliance serving the interests of both the public and the profession. Committed to these important concerns, we ought not turn our attention backwards to the asserted infractions of respondents consisting of only a few, brief radio commercials—innocuous in the larger scheme of things.

Furthermore, in opting for discipline, we backtrack. In our last case involving commercial speech, *In re Professional Ethics Advisory Comm. Op. 475, supra,* we made clear that we intended to act in our legislative capacity by initiating the promulgation of sound and valid rules governing professional commercial speech. Implicit was the promise of our full consideration and protection of constitutional interests in such speech. Our new rules, while not yet tested, have certainly addressed these constitutional concerns. Today, we shift our sights. Instead of

interring the ban on broadcast advertising, we resurrect it. Our legislative function is abandoned; an enforcement role is assumed. It is an unwise course. In the context of this case, we ought not as a matter of sound discretion insist upon the enforcement of an unconstitutional regulation. *See Supreme Court of Va. v. Consumers Union of the United States,* 446 *U.S.* 719, 100 *S.Ct.* 1967, 64 *L.Ed.2d* 641 (1980).

As a Court, we appreciate the distinction between disciplinary rules that impact upon solemn constitutional interests, such as free speech, and those that do not. *In re Rachmeil, supra; In re Hinds, supra.* Not all disciplinary rules are of equal importance. When the State's regulatory arsenal is turned toward conduct that implicates constitutional rights of speech, we should be exceedingly chary before unleashing our disciplinary fire. *Id.*

We have an enormous range of discretion in the exercise of our disciplinary function. I believe that our discretion would be exercised prudently in this case by dismissing these proceedings without the additional imposition of discipline. All important interests generally to be served by discipline will have been adequately and appropriately addressed by our opinion. Its message is clear and commanding. It is both instructive to the public and hortative to the profession. More, it is a self-executing rebuke, an unmistakable disapproval of respondents for their cavalier attitude toward the disciplinary structure. Little more is to be gained, and much may be lost, by our insistence that formal punishment be meted in this case.

I believe, respectfully, that the decision to impose discipline in this case is an imprudent and mistaken exercise of our discretion. I therefore dissent.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, POLLOCK, O'HERN and GARIBALDI— 6.

Dissenting—Justice HANDLER—1.