701 A.2d 1303

IN THE MATTER OF ALLEGATIONS OF VIOLATIONS OF LAW AND ADMINISTRATIVE CODE BY A. FIORE & SONS, INC., ANDREW FIORE, JR., THEODORE FIORE AND ANDREW FIORE, SR. (DECEASED), INDIVIDUALLY AND AS OFFI- CERS, DIRECTORS AND SHAREHOLDERS.

Superior Court of New Jersey
Appellate Division

Argued October 7, 1997—Decided November 5, 1997.

 

Before Judges DREIER, PAUL G. LEVY and WECKER.

*Harry L. Starrett* argued the cause for appellants A. Fiore & Sons, Inc.; Andrew Fiore, Jr.; Theodore Fiore; and Andrew Fiore, Sr. (deceased) (*Starrett & Klinghoffer,* attorneys; *Mr. Starrett,* on the brief).

*Gail M. Lambert,* Deputy Attorney General argued the cause for respondent Department of Environmental Protection (*Peter Verniero,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Lambert,* on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Appellants, A. Fiore & Sons, Inc. ("Fiore"), the Estate of Andrew Fiore, Sr. (who died while this appeal was pending), Andrew Fiore, Jr., and Theodore Fiore, appeal from the assessment of a monetary penalty of $145,219, the revocation of the corporation's Certificate of Public Convenience and Necessity, and the permanent debarment of the individual Fiores from participating in the solid waste disposal industry in New Jersey. We reverse and remand this matter to the Commissioner of the Department of Environmental Protection ("DEP") for reconsideration.

Fiore is in the trash collecting, recycling and disposal business. It is a continuation of a sole proprietorship founded by the late Andrew Fiore, Sr. in the 1940's and reorganized as a closely held corporation with Andrew Sr., Andrew Jr., and Theodore owning the business as equal shareholders. Following Andrew Sr.'s death, the corporation redeemed his corporate stock and Andrew Jr. became the president of the corporation. It has held a Certificate of Public Convenience and Necessity as a solid waste collector since 1975. Since 1982, Fiore has conducted the bulk of its operations from an Essex County site on McCarter Highway in Newark which it shared with an affiliated corporation, A. Fiore & Sons Salvage, Inc. ("Salvage"). Salvage was incorporated in 1985, and had been operating under a DEP order permitting it to function as a transfer station and recycling facility as well as a "materials recovery facility" as defined in *N.J.A.C.* 7:26–1.4. Although the time was not specified, it appears that Salvage merged into Fiore so that there now is but one corporation.

Fiore's waste collection business employs approximately sixty employees and provides solid waste disposal services to more than one thousand customers in eight New Jersey counties, including Passaic and Morris. The collections from these two counties involved less than 4% of Fiore's total collection business. Its trucks collect unseparated recyclable and non-recyclable materials, and return them to the McCarter Highway site where they are dumped and sorted. Recyclable materials are removed both mechanically and manually, leaving only residual solid waste. This waste is then loaded into containers for shipment to a disposal facility.

The problem in this case emanates from the fact that when the waste was dumped, the materials collected from Morris County and Passaic County were not processed and segregated from materials collected from customers in the other counties in Fiore's service territory. Conflicting waste flow control directives in the 1980's required that solid waste collected from specific counties be taken to designated disposal sites within these counties. In 1983,

the DEP addressed the problem and published what became known as the "Pereira policy." Under that policy, transfer stations are permitted to "accept solid waste from various origins as long as the solid wastes, or a similar amount and type, are ultimately transported for disposal to the facility designated" by the DEP for the county of origin. *See Passaic Cty. Utils. Auth. v. DiBella Sanitation Serv., Inc.,* 272 *N.J.Super.* 238, 240, 639 *A.*2d 745 (App.Div.1994).

Later, the DEP issued another policy concerning disposal of solid waste residue requiring that the waste from each county be kept separate in the truck and separate in the transfer station. This "Separate policy" required the segregation of inbound solid waste by county so that there would be no mixing or commingling of this waste or resulting residue. At one point in the 1980's the Board of Public Utilities (later the Board of Regulatory Commissioners) ("Board"), the DEP, and the Passaic County Utilities Authority ("PCUA") had such conflicting regulations that it was impossible for Fiore to comply with any one of them without violating another.

In 1987 and 1988, the Board issued franchise orders granting the PCUA and the Morris County Transfer Station, Inc. ("MCTS") the "exclusive right to control and provide for the disposal of solid waste" in Passaic and Morris Counties, respectively. The Board and the DEP then issued waste flow control orders requiring that the Separate policy for disposal be implemented, rather than the Pereira policy which the DEP, at least at an earlier time, had authorized.

Fiore's attorneys advised Fiore in 1987 that the residue emanating from its Essex County facility after separation of recyclables was Essex County waste, and therefore was unregulated and could be disposed of either in Essex County or even shipped outside New Jersey. Such out-of-state shipment to licensed facilities provided a tremendous cost-savings to Fiore. Fiore's position had been bolstered by a letter received from the DEP in September 1987, recognizing the out-of-state shipment, but stating that the

haulers employed by Fiore to transport the residue to the out-of-state sites were required to register with the DEP. Significantly, the ALJ who initially determined this matter agreed with this interpretation, as did a DEP employee (Sondermeyer) when testifying in another case involving Fiore.

In March 1988, the DEP filed an unrelated action against Fiore and other haulers for failure to follow the waste flow control orders for Essex County. At that time, the DEP clearly indicated to Fiore its position that out-of-state disposal was illegal. Furthermore, the DEP informed Fiore that it must adhere to the Separate policy for residue disposal at the designated disposal facilities. While so indicating to Fiore, the DEP apparently promoted the Pereira policy vigorously as its official agency position in cases involving other haulers. We have been unable to locate in this extensive record any statement by the DEP contradicting this assertion.

In the summer of 1989, Fiore received the first of numerous summonses from the PCUA charging violations of waste flow regulations. In addition to Passaic County, Morris County asserted that the solid waste generated in that county must be disposed of at its facility pursuant to the waste flow control orders. Later in 1989, Fiore began to negotiate with Essex County officials for the disposal at the Essex County facilities of all the solid waste residue Fiore generated. By April 1990, an agreement was reached with Essex County, and Fiore ceased disposing of its residue out-of-state. The Essex County disposal was with Essex County's knowledge of the source of the waste, and nothing was hidden from the DEP. Nevertheless, Fiore was not in compliance with the DEP's waste flow orders for Passaic and Morris Counties.

In July 1990, after negotiations, the Board entered an Interim Rate Order granting rate relief to Fiore in the form of increased disposal fees that it could charge its customers. In that order was a stipulation between Fiore and the Board that Fiore would use the disposal sites designated under the waste flow control orders.

In Passaic and Morris Counties the designated sites were as specified by the PCUA and the MCTS. Despite the order, Fiore continued to dispose of the residue in the Essex County facilities. Fiore's position was that until the conflicting orders were resolved, it would dispose of the residue at the closest facility. It contends that it did not take advantage of the Interim Rate Order by charging higher rates to Morris or Passaic Counties, but charged its customers only the Essex County rates because it was these charges that it had itself incurred.

Finally, on June 28, 1991, the Board moved to have the Interim Rate Order declared null and void because of Fiore's failure to use the designated sites. Later the Board withdrew its motion because of informal agreements it had entered into with Fiore. According to Fiore, these agreements finally meant that the DEP would no longer insist that Fiore follow the Separate policy for residue disposal, but could apply the Pereira policy which did not require segregating the Morris and Passaic Counties' collections and residue. Shortly thereafter, Fiore began depositing solid waste in Passaic, Morris and Essex Counties in accordance with the Pereira policy.

In August 1990, however, the PCUA had filed a complaint with the Board to enjoin Fiore from removing solid waste from Passaic County. Thereafter the Board filed its own expanded action against Fiore and dismissed the PCUA's complaint, but granted the PCUA permission to intervene in the Board's action. The separate claims of the PCUA and the MCTS against Fiore were settled during the course of this litigation and they have no active role in this appeal. The Board's litigation, however, has proceeded from 1991 through the present time. In January 1991, the matter was transferred to the OAL as a contested case.

On September 22, 1993, the Board moved for a partial summary decision on the issue of liability. The motion was grounded on Fiore's admission that it had disposed of the solid waste it had collected in Passaic and Morris Counties between 1988 and 1991 at facilities located either out-of-state or in Essex County. Fiore

opposed the motion on the grounds that it had defenses to the violations that precluded the grant of summary judgment. Prior to an evidentiary hearing, during a telephone conference of October 12, 1993, the ALJ indicated that the Board's motion would be granted on liability, and that the only remaining issues to be resolved at trial were the penalties to be imposed for the violations. The conforming order was entered on October 19, 1993.

At the October 18, 1993 hearing, a DEP investigator (Smollin) testified that he calculated the proposed monetary penalty of $145,218.74, although as noted *infra*, the basis for this computation is subject to challenge. At the second hearing, held on October 25, 1993, Andrew Fiore, Jr. testified concerning Fiore's mitigation defense, asserting that Fiore had been the victim of confusing DEP waste flow control policies that conflicted with policies implemented by the counties in which Fiore collected the solid waste. Throughout these proceedings Fiore asserted that it had legally disposed of the materials in Essex County and out-of-state and then solely at the Essex County facilities.

On March 21, 1994 and March 22, 1994, the ALJ issued decisions denying Fiore's motion to reopen the record.[1] The ALJ

---

[1] During the hearings there also were procedural motions which are the basis of Fiore's additional arguments that certain State employees should have been produced to testify in response to Fiore's subpoenas. The subpoenas had been quashed by the ALJ, but the Board itself had requested that the testimony of at least one of them be read into evidence from a related Superior Court matter. When Fiore indicated that it would then have the right to produce this employee for cross-examination, the Board withdrew its request. Fiore also sought to disqualify the Board's attorney because of dual representation of different agencies against Fiore, and because she had not produced information obtained from DEP employees in unrelated cases which supported Fiore's defense that it was the victim of the DEP's "contradictory, conflicting and inconsistent waste-flow policies and improper selective enforcement" of waste flow control rules for Passaic and Morris Counties. The ALJ ruled against Fiore on these motions, noting that the conflicting policies were a matter of record and therefore there was no reason for disqualification or to produce the State employees. On remand, if the Board disputes not only that the various regulations were conflicting, but that other waste haulers were permitted to follow the Pereira policy, Fiore should be able to call witnesses including State employees, to show,

concluded that Fiore had made a "conscious choice" to utilize out-of-state facilities for solid waste disposal rather than comply with any of the conflicting regulations. Fiore does not disagree but contends that its actions were lawful.

On May 16, 1994, the United States Supreme Court issued its decision in *C & A Carbone, Inc. v. Town of Clarkstown*, 511 *U.S.* 383, 114 *S.Ct.* 1677, 128 *L.Ed.*2d 399 (1994). This was the first of several decisions that definitively determined that the Board's and Counties' regulation of the out-of-state shipment of residue by Fiore was unconstitutional. As we will discuss, *infra*, although the ALJ, the Board and the DEP Commissioner have attempted to disregard or distinguish this series of decisions, Fiore's out-of-state disposal of the residue was a protected right under the dormant Commerce Clause. The local ordinance voided in *Carbone* was similar to the waste flow control regulations in New Jersey, and in fact, Justice O'Connor in her concurring opinion specifically called into question, on Commerce Clause grounds, the validity of New Jersey's and other states' waste flow control laws. 511 *U.S.* at 406 n. *, 114 *S.Ct.* at 1690 n. *, 128 *L.Ed.*2d at 417 n. *.

The State authorities, however, continued to press for a final decision against Fiore on the basis of a District Court's oral opinion in *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders*, then on appeal to the Third Circuit Court of Appeals. The District Court's resolution of the case involved a Pennsylvania transfer station that was precluded, under the same regulatory system being enforced against Fiore, from receiving construction and demolition waste from New Jersey. The District Court decision appeared consistent with the Third Circuit's prior decision in *J. Filiberto Sanitation, Inc. v. New Jersey Dep't of Envtl. Protection*, 857 *F.*2d 913, 918–23 (3d Cir.1988), (later overruled), which had specifically held that New Jersey's regulatory scheme did not violate the Commerce Clause. Since *Carbone* had

---

in mitigation of penalty, the reasonableness of its actions in using the Essex County disposal facilities.

not overturned the New Jersey system, and the existing precedent in New Jersey supported it, the ALJ and Commissioner proceeded.

On November 16, 1994, the ALJ issued her initial decision recommending substantial penalties against Fiore and the individual defendants. She accepted the penalty calculation of $145,219, rejected any mitigating defenses, and recommended that Fiore's Certificate of Public Convenience and Necessity be revoked and the individual Fiores be debarred from owning, operating, managing, controlling, or having any interest in any solid waste business in New Jersey. The ALJ based her decision, in part, on an earlier order of the Commissioner. She further noted that New Jersey's waste control laws had been upheld as constitutional and "that New Jersey's solid waste system should be assumed to be valid until the Third Circuit reviews the impact of *Carbone*." On December 16, 1994, Fiore and the individual defendants filed extensive exceptions, including an exception to the finding that *Carbone* was not applicable to this case. The Board opposed the exception, and on February 8, 1995, the DEP Commissioner entered a decision and order adopting, with negligible modifications, the ALJ's initial decision, stating "New Jersey's waste flow system is presumed valid and will be fully enforced," absent any judicial finding that the system is constitutionally defective.

Eight days later, on February 16, 1995, the Third Circuit issued its decision in *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders*, 48 *F*.3d 701 (3d Cir.1995). The Third Circuit there reversed the District Court's decision and overruled *J. Filiberto Sanitation. Id.* at 713 n. 17, 717–18. The Third Circuit also remanded the matter to the District Court for a determination whether these regulations could survive application of the "heightened scrutiny test" for constitutionality under the dormant Commerce Clause. *Id.* at 717–18.

Fiore immediately filed a notice of motion seeking reconsideration and vacation of the Commissioner's decision. The Board again opposed this application, noting that *Atlantic Coast* had not

declared New Jersey's waste flow scheme unconstitutional nor did it invalidate the scheme. The Commissioner denied the motion for reconsideration, reasoning that reliance on *Atlantic Coast* was misplaced, but he did issue a stay of his final decision pending resolution of this appeal which was timely filed from his decision.

On July 15, 1996, the District Court issued its decision on remand in *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County,* 931 *F.Supp.* 341 (D.N.J.1996), applying the "heightened scrutiny test." The Court determined that "New Jersey's system of flow control of waste violates the Commerce Clause." *Id.* at 358. The District Court granted a permanent injunction prohibiting enforcement of the waste flow control regulations against processors of construction and demolition waste and processors of all other types of solid waste. *Id.* at 358–59.

Both parties appealed aspects of that decision to the Third Circuit, and supplemental briefs were filed in the case before us. While this matter has been pending, however, the Third Circuit issued its new decision in *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County,* 112 *F.*3d 652 (3d Cir.1997). The Court adhered to the heightened scrutiny test applied by the District Court, *id.* at 663, and in applying the test, agreed with the District Court's "conclusion that New Jersey's present flow control system is unconstitutional under the dormant Commerce Clause." New Jersey may not "protect the local waste disposal market, and thereby exclude out-of-state competitors, in order to use inflated revenues to finance the substantial debts of its waste management districts." *Id.* at 667. The Court considered the State's argument that the expenses of maintaining the various county facilities could not be met if out-of-state shipments were permitted, but after reviewing many alternatives still open to the State, noted that "the State's financial losses alone cannot justify discrimination against interstate commerce. The Supreme Court has long held that the expense of dismantling

a discriminatory system does not justify a state's continued enforcement of that system." *Id.* at 666.

The Third Circuit vacated a two-year stay imposed by the District Court that permitted the State to recover from the financial impact of its decision. The Court also stayed its own decision and injunction against the State and noted that it will "become effective only upon the exhaustion or passage of time for all appeals or upon the denial of petitions for certiorari by the Supreme Court of the United States or upon the United States Supreme Court's final decision in this case affirming this court's judgment." *Id.* at 673.

With a change in the governing law and with Fiore having been faced with conflicting policies expressed in conflicting regulations, we must first decide whether *Atlantic Coast* should be given retroactive effect, and then determine if the resolution of this matter by the Commissioner was arbitrary, capricious or unreasonable. When we review an agency decision, we are narrowly limited. An administrative determination will be overturned only if it is "arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record." *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). We will also give deference to an administrative agency's expertise where the case is one "involving technical matters within the agency's special competence." *In re Vineland Chem. Co.,* 243 *N.J.Super.* 285, 309, 579 *A.*2d 343 (App.Div.), *certif. denied,* 127 *N.J.* 323, 604 *A.*2d 598 (1990). To substitute our judgment for that of any agency, we must be convinced that the agency's judgment was clearly mistaken and "so plainly unwarranted that the interests of justice demand intervention." *Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 588, 538 *A.*2d 794 (1988) (quoting *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)).

The Board argues that even if the *Atlantic Coast* decision is to be given effect, its effect should be prospective only, and therefore should not affect the actions taken by Fiore exercising its now-declared constitutional right to ship the waste out-of-state.

The Third Circuit in *Atlantic Coast* gave a strong indication of its opinion on this subject. While stating that the Court "need not decide any of these retroactivity questions in this case," 112 *F*.3d at 672, it made this statement in relation to the aggrieved party's "appropriate remedy for a constitutional violation." *Ibid.* While the issue of using the decision as a sword may be undecided, the same principle may not apply to its use as a shield against enforcement of unconstitutional regulations.

· Fiore contends that the federal determination of unconstitutionality should be applied retroactively in this pending case to nullify any liability and vacate all penalties for violation of the waste flow control orders for Passaic and Morris Counties. The DEP, relying on *Chevron Oil Co. v. Huson,* 404 *U.S.* 97, 106–07, 92 *S.Ct.* 349, 355, 30 *L.Ed.*2d 296, 306 (1971), argues against any retroactive application of *Atlantic Coast.* However, the Court in *Atlantic Coast* noted specifically that "the Supreme Court's latest retroactivity jurisprudence has overruled *Chevron Oil*'s equitable balancing test as the determinant of whether a new principle of law will be applied retroactively." 112 *F*.3d at 672 (citing *Reynoldsville Casket Co. v. Hyde,* 514 *U.S.* 749, 751–53, 115 *S.Ct.* 1745, 1748, 131 *L.Ed.*2d 820, 826–30 (1995) and *Harper v. Virginia Dep't of Taxation,* 509 *U.S.* 86, 97, 113 *S.Ct.* 2510, 2517–18, 125 *L.Ed.*2d 74, 86–87 (1993)). Both *Reynoldsville* and *Harper* clearly point to retroactive application. As stated in *Harper:*

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.
>
> [509 *U.S.* at 97, 113 *S.Ct.* at 2517, 125 *L.Ed.*2d at 87].

Although *Harper*'s holding expressly referred to Supreme Court decisions, "there is no cogent basis for distinguishing decisions handed down by the inferior federal courts" when applying the *Harper* retroactivity rule. *Laborers' Int'l Union v. Foster Wheeler Corp.,* 26 *F*.3d 375, 386 n. 8 (3d Cir.), *cert. denied,* 513 *U.S.* 946, 115 *S.Ct.* 356, 130 *L.Ed.*2d 311 (1994). Thus the *Chevron Oil* retroactivity test upon which the Commissioner relied has been effectively replaced by the *Harper* Court's rule requiring retroac-

tive application to pending cases of newly-announced federal case law's interpretation of federal constitutional rules.

The State argues to the contrary; it asserts that the unconstitutionality of the out-of-state distribution prohibition should not be applied retroactively. As support, it urges the application of unpublished Appellate Division decisions that in turn relied heavily upon *Walker v. Birmingham,* 388 *U.S.* 307, 320–21, 87 *S.Ct.* 1824, 1832, 18 *L.Ed.*2d 1210, 1219-20, *reh'g denied,* 389 *U.S.* 894, 88 *S.Ct.* 12, 19 *L.Ed.*2d 202 (1967), and *In re Felmeister,* 95 *N.J.* 431, 442–48, 471 *A.*2d 775 (1984).

We reject this analysis for two reasons. First, the retroactivity issue is governed by *Reynoldsville* and *Harper,* the more recent and directly applicable statements of the United States Supreme Court. Second, *Walker* and *Felmeister* were the responses of the courts to direct challenges to judicial power. These cases are therefore not relevant to the current discussion.[2]

This case is also unlike *In re Certain Amendments to the Adopted and Approved Solid Waste Management Plan,* 133 *N.J.* 206, 213–24, 627 *A.*2d 614 (1993) and *Passaic County Utilities, supra,* 272 *N.J.Super.* at 245–46, 639 *A.*2d 745. In those cases, waste flow orders were invalidly adopted, but the Board and the DEP were permitted to cure the defects and then retroactively apply the then-valid orders to the regulated parties. There is a difference, however, between an invalid order that is subject to cure and a restriction that unconstitutionally infringes upon a party's rights. In the case before us, the restriction against out-of-state shipments cannot be cured. Unless *Atlantic Coast* is reversed or severely modified, and the United States Supreme Court backs away from its determinations in *Carbone,* the orders

---

[2] In *Walker,* civil rights marchers were deemed subject to contempt for violating a state court's injunction, even though the injunction may have been constitutionally questionable. 388 *U.S.* at 319–22, 87 *S.Ct.* at 1831–33, 18 *L.Ed.*2d at 1219–20. In *Felmeister,* attorneys were found subject to discipline for violation of a court rule barring broadcast advertising, even though that rule was subject to constitutional challenge. 95 *N.J.* at 442–47, 471 *A.*2d 775.

prohibiting out-of-state shipment were constitutionally defective and the penalties imposed therefor must be rescinded.

We have assumed for the purpose of our discussion that the law as expressed in *Atlantic Coast* will remain in effect after the petition for *certiorari*. Because we must remand this matter in any event, with a stay of the Commissioner's order, the Commissioner should reconsider his ruling in light of *Atlantic Coast*, including its retroactivity language. Of course, if *Atlantic Coast* is reversed or modified on appeal, the Commissioner should apply whatever the guiding rule might be.

We have expressed our concern with the fact that Fiore's out-of-state shipments were, in fact, in exercise of its constitutional right to do so, and we note that a contrary assumption was one of the foundations for the penalties imposed in this case. The legal basis for the attack on the bulk of Fiore's alleged illegal shipments has since shifted and had been recognized by the ALJ and the Commissioner. The ALJ expressly stated that her decision was contingent upon the Court's final resolution of the impact of *Carbone*. The Commissioner's decision was likewise conditioned upon no later adverse finding of a constitutional defect.

We are also concerned with the fact that Fiore had been faced with conflicting administrative rules and directives until it was finally permitted to follow the Pereira policy. We note that from the point that the Pereira policy was authorized for Fiore, it has complied with this single directive. We are further impressed by the fact that the entire dispute here relates only to 2.1% of Fiore's collections which came from Morris County and 1.8% of its collections which came from Passaic County. Apparently, there is no dispute that over 96% of Fiore's collections were disposed of in accordance with the applicable regulations governing the counties from which that waste had been collected. Another salient factor is that Fiore is not alleged to be a polluter or that it cut any corners in the safe disposition of the solid waste it collected.

Furthermore, we note that Fiore's use of the out-of-state and Essex County disposal sites was a result of it having no "safe

harbor" method of disposing the waste without violating the regulations of the counties or State. The State insists that Fiore should have chosen one of the conflicting systems. Instead, however, it chose what now appears to be a constitutionally protected out-of-state shipment and an arguable, but apparently incorrect, disposition of the balance in Essex County based on the advice of its counsel.

*Atlantic Coast* did not vacate or void the New Jersey intra-state system of solid waste disposition. The Court clearly stated that the State and counties "remain free to regulate the flow of waste within New Jersey so long as the State's laws and regulations treat in-state and out-of-state facilities equally." 112 *F*.3d at 669. Thus, in assessing Fiore's actions, the State still has the power to consider the Essex County disposition and Fiore's alleged violation of the then-existing conflicting regulations.

A balancing of these factors on remand, assuming that *Atlantic Coast* is substantially affirmed or *certiorari* is denied, should cause the Commissioner radically to reassess the penalties imposed. As was noted at oral argument before us, the State and Fiore have fought a legal battle for the better part of a decade. Here, they have argued over 3.9% of Fiore's collections, and no facts appear to have been hidden from the State by Fiore, which has asserted its legal right to take the disputed actions. At the end of the battle, it appears that Fiore's position has been vindicated concerning the out-of-state shipments, and that it has had an arguable claim that the conflict in regulations permitted it to utilize the most efficient facility until the State and counties could settle upon a single policy.

It is inconceivable to this court that on these facts Fiore could be forced to close down its fifty-year-old business operations, and suffer permanent debarment of its individual owners from the industry. Such a Draconian penalty under the facts of this case and the law as it now exists is both arbitrary and unreasonable.

Both the ALJ and Commissioner recognized that if the underlying constitutional claim was decided in Fiore's favor in a

final judgment in *Atlantic Coast*, there would have to be a reassessment of this case. We agree. We can understand that some monetary penalty might be imposed, although there might well be a sizable downward modification when the Commissioner disregards the out-of-state shipments. It further appears that the State has not calculated the ratios of the materials that should have been returned to Morris and Passaic Counties based upon the post-recycling volume and that some recomputation on this basis must also be accomplished. The "per-ton" penalty appears to be without precedent, with a per truck-load penalty being the usual remedy. But we will not interfere with the method of calculation of an appropriate reduced penalty since the grant of authority to an administrative agency to assess appropriate penalties is to be liberally construed. *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562, 384 *A.*2d 795 (1978). The Commissioner might even determine that any remaining penalties should relate to the costs saved by Fiore, if any, in utilizing the Essex County facility. We surmise that if Fiore did not charge the higher rates to Morris and Passaic Counties, there may have been no cost-savings to Fiore, but only to its customers. The Commissioner may further take into consideration the obvious and substantial expense that Fiore has incurred because the State found it difficult to extend the Pereira policy to Fiore for so long a period.[3] The Commissioner also should not lose sight of the fact that it was the Board that for years withheld from Fiore a firm commitment that it could follow the Pereira policy, which apparently had been made available to other haulers, and that when this was finally accomplished, Fiore complied.

We assume that there still may be some penalties to be assessed against Fiore, since the Commissioner had the right to consider unreasonable Fiore's implicit premise that its disposal of Passaic County and Morris County solid waste residue in Essex County

---

[3] We disagree, however, with Fiore that a two-year statute of limitations is applicable; this was not a forfeiture proceeding.

would be essentially unregulated, although every other aspect of its business was subject to rigorous regulation. Even with only shared responsibility for this sad state of affairs, Fiore cannot assert that it was blameless. Fault, however, clearly lies on both sides in this case.

We, of course, cannot and will not exercise the Commissioner's discretion and set an appropriate penalty, if any. But all of the factors we have noted, which apparently did not move the Commissioner before, leap out at us from this extensive record. Certainly, the loss of the Certificate of Public Convenience and Necessity and the debarment orders were excessive penalties.

The order appealed from is reversed, and this matter is remanded to the Commissioner of the Department of Environmental Protection for reargument and reconsideration and, if necessary, for expansion of the record. Given the extended history of this case, however, we strongly suggest to the parties that the matter now be brought to a speedy, and if possible, amicable resolution.

Reversed and remanded for reconsideration.